Susan ZINTEK, Arthur Zintek, Northwestern Mutual Life Insurance Company, Wausau Insurance Companies and Megan Zintek and Erin Zintek, minors, by their guardian ad litem, Plaintiffs-Respondents,

v.

Robert PERCHIK, M.D., Gerald Dorff, M.D., Wisconsin Health Care Liability Insurance Plan, The Professionals Insurance Company and Wisconsin Patients Compensation Fund, Defendants-Appellants.†

Court of Appeals

*Nos. 90-0838, 90-1795. Oral argument March 5, 1991.—Decided May 29, 1991.*

(Also reported in 471 N.W.2d 522.)

†Petition to review denied.

440

441

443

446

On behalf of the defendants-appellants, there were briefs filed by *Donald R. Peterson* and *Peter F. Mullaney* of *Peterson, Johnson & Murray, S.C.* of Milwaukee. There was oral argument by *Donald R. Peterson* and *Judith Pinchar.*

On behalf of the plaintiffs-respondents, there was a brief filed by *J. Ric Gass* of *Kasdorf, Lewis & Swietlik, S.C.* of Milwaukee and *Mary L. Woehrer, J.D.,* of Wauwatosa. There was oral argument by *J. Ric Gass.*

Before Nettesheim, P.J., Brown and Scott, JJ.

NETTESHEIM, P.J. In this medical malpractice action, a jury awarded Susan Zintek $2,285,000 in damages.[1] The trial court also awarded Susan $96,047 in

---

[1]The other plaintiffs are Arthur Zintek, Susan's husband; Megan and Erin Zintek, the Zintek children; and two subrogated insurance carriers, Northwestern Mutual Life Insurance Company and Wausau Insurance Companies. Unless the context

taxable costs, disbursements and postverdict interest. The principal defendants-appellants are Dr. Robert Perchik and Dr. Gerald Dorff, two physicians who treated Susan's heart cardiac condition.[2]

The appellants raise eight issues on appeal: (1) whether the special verdict should have inquired as to the alleged negligence of two non-party physicians who also rendered treatment to Susan; (2) whether the trial court correctly instructed the jury as to the appropriate standard of care; (3) whether the trial court's jury reinstruction on the five-sixth's rule "coerced" a verdict; (4) whether the trial court properly refused the appellants' request to conduct informal *ex parte* discovery discussions with Susan's then-treating physicians; (5) whether the trial court properly awarded Susan certain taxable costs and disbursements, including interest on the verdict; (6) whether the evidence supports Susan's past wage loss award and whether this award is excessive; (7) whether the trial court properly excluded evidence of Susan's disability benefits; and (8) whether the trial court properly denied the appellants a new trial in the interest of justice.

We are unpersuaded by the appellants' arguments. We affirm the trial court's judgment and order denying postverdict relief.

## FACTS

We recount the facts in some detail. On the evening of August 1, 1985, Susan began experiencing numbness

requires otherwise, we refer to the plaintiffs-respondents collectively as "Susan."

[2]The other defendants-appellants are the Wisconsin Patients Compensation Fund and the liability insurance carriers for Dr. Perchik and Dr. Dorff.

in her jaw, together with pain in her chest and left arm. After consulting with Susan's obstetrician,[3] Susan's husband, Arthur, drove her from their home in Cedarburg to St. Joseph's Hospital (St. Joseph's) in Milwaukee, some thirty to forty minutes away.

The Zinteks arrived at St. Joseph's at approximately 10:00 p.m. By this time, Susan's pain had subsided. Dr. Perchik, an emergency room physician, checked Susan's vital signs, placed her on a heart monitor and ordered an electrocardiogram (EKG). Dr. Perchik concluded that the EKG results did not show signs of abnormality. Accordingly, he discharged Susan from St. Joseph's at approximately 10:35 p.m.

During the journey back to Cedarburg, Susan's chest pain returned with greater intensity. The Zinteks returned to St. Joseph's, arriving at the emergency room this second time about 11:34 p.m. Susan was again seen by Dr. Perchik who determined that she was having an acute myocardial infarction (heart attack).

Because St. Joseph's policy provided that emergency room physicians may not admit a patient to the hospital, Dr. Perchik asked Arthur who should be called to admit Susan. Arthur told Dr. Perchik that he knew and had been a patient of Dr. Gerald Dorff. Dr. Dorff is a doctor of internal medicine, specializing in the treatment of infectious diseases. Dr. Perchik called Dr. Dorff, who agreed to admit Susan to St. Joseph's intensive care unit. Accordingly, Susan was admitted and then transferred from the emergency room to the intensive care unit shortly after midnight.

The evidence is in conflict regarding certain critical events occurring between Susan's admission shortly after midnight and Dr. Dorff's first examination of

---

[3]Approximately a week prior to this incident, Susan had given birth to the Zinteks' second child.

Susan some five hours later. Specifically, three interrelated matters are unclear: when the decision was made that a cardiologist should be called, who contacted the cardiologist, and, most importantly, when this contact was made.

Dr. Dorff testified that after making an admission by telephone, it was his usual practice to call the resident physician on duty with St. Joseph's teaching service, ask the resident to examine the patient, and report back to him by telephone. Dr. Mark Hermans was the resident on duty the early morning of Susan's admission. Dr. Hermans' deposition testimony indicated that he called Dr. Dorff to discuss Susan's condition, and that Dr. Dorff agreed a cardiologist should be consulted.

Following this conversation, Dr. Hermans called Dr. Michael Reid, a cardiologist. Dr. Hermans' testimony offers two different versions of when he placed this call. One version has Dr. Hermans calling Dr. Reid approximately an hour to an hour-and-a-half after Susan's arrival; another version has Dr. Hermans calling Dr. Reid within thirty to forty minutes of Susan's admittance. In any event, Susan's medical record bears a notation in Dr. Hermans' handwriting that Dr. Reid had been "notified to see [Susan] in the morning." Dr. Hermans neglected to write the time of this entry next to this note. Dr. JoAnn Alexanian, a medical intern on duty with Dr. Hermans, testified by deposition that Dr. Hermans made the note regarding Dr. Reid sometime before 1:30 a.m.

At trial, Dr. Dorff testified that he did not make the initial contact with Dr. Reid. Dr. Dorff also testified that he could not remember when he first spoke with Dr. Reid concerning Susan. However, the jury learned that in his deposition before trial, Dr. Dorff had testified that

450

he personally contacted Dr. Reid, but that he could not remember when.

Dr. Reid offered a third version via his deposition testimony. Dr. Reid testified that he could not remember who called to request that he see Susan, but that he was first contacted around 7:30 to 8:30 a.m. on August 2. Despite this conflicting evidence, the medical record indicates that Dr. Reid first saw Susan at approximately 8:30 a.m. on August 2. Following this examination, Dr. Reid ordered changes in Susan's medication and inserted a device which measures pressure within the heart.

Dr. Reid was slated to leave on a vacation later that day. Accordingly, Dr. Reid requested that another cardiologist, Dr. James Botticelli, take over the cardiological aspects of Susan's care until his return. Dr. Botticelli served in this capacity from August 3 until August 12.

Five days later, while still in the hospital, Susan suffered a second heart attack. To ease her resulting chest pains, the intern on duty started administering medications at approximately 7:00 a.m. These medications produced a secondary effect of lowering Susan's blood pressure. Later, when her blood pressure became too low, Susan received counteracting medication. Dr. Botticelli was called about 7:12 a.m. In the meantime, Dr. Dorff had begun his morning rounds in the hospital. He also was apprised of this turn in Susan's condition. Sometime that morning—the record does not indicate when—Dr. Dorff wrote a progress note in Susan's file indicating that he agreed with the medications she was receiving. Dr. Dorff also noted that Susan might need "invasive procedures," but that he was awaiting a cardiology opinion to that effect.

Susan's condition continued to deteriorate. Dr. Botticelli was given a status report at 8:20 a.m. By the time he arrived to see Susan at 9:00 a.m., Susan's condition

was such that he summoned a cardiac surgeon to insert an intra-aortic balloon pump to keep her alive.

Susan's heart attacks of August 1–2 and August 7 created such cumulative damage that a heart transplant was the only therapeutic option. Susan received this transplant on October 25–26, 1985.

Susan's amended complaint alleged medical malpractice only against the appellants, Dr. Perchik and Dr. Dorff. She did not sue Dr. Reid or Dr. Botticelli. Nor did Dr. Perchik and Dr. Dorff implead Dr. Reid or Dr. Botticelli. The matter was tried to a jury from October 24 through November 10, 1989. The jury found Dr. Perchik 40% causally negligent and Dr. Dorff 60% causally negligent. Dr. Perchik and Dr. Dorff appeal.

## 1. THE SPECIAL VERDICT

The appellants contend that the trial court erred in refusing to submit the claimed negligence of Dr. Reid and Dr. Botticelli on the special verdict.

This issue first surfaced before trial when the appellants submitted a proposed special verdict inquiring as to Dr. Reid's and Dr. Botticelli's alleged negligence and seeking an apportionment of negligence among Drs. Perchik, Dorff, Reid and Botticelli. Susan responded with a motion *in limine,* seeking to bar any evidence concerning the alleged negligence of Drs. Reid and Botticelli on the special verdict.

At the hearing on this motion, the parties set out their respective trial theories. As their principal line of defense, the appellants contended that Susan's heart attacks were caused by a rare condition not within the common knowledge of similarly situated physicians in 1985. Thus, the appellants contended that no one rendered inappropriate treatment to Susan.

452

Alternatively, and in support of their proposed special verdict, the appellants anticipated that Susan's evidence might show that certain procedures, which only a cardiologist is competent to perform, could have and should have been performed on Susan on the night/morning of August 1–2; that such procedures could have alleviated some of the damage to Susan's heart; that because she did not have the benefit of such early and aggressive measures, Susan had to receive a course of medications which contributed to her second heart attack, and, ultimately, to the necessity for transplant surgery. The appellants argued that this theory would demonstrate that if anyone acted negligently, it was Dr. Reid and Dr. Botticelli.

In response, Susan maintained that Dr. Reid and Dr. Botticelli were not negligent, that no expert witness had given any discovery opinion that Drs. Reid and Botticelli were negligent, and that the responsibility for the chain of events necessitating her heart transplant rested with Dr. Perchik initially and Dr. Dorff thereafter.

Understandably, the trial court declined to make a substantive ruling at this pretrial juncture, stating that it would rule on the question once the evidence was closed.

Following the close of evidence, the parties and the court revisited this issue. Noting that no expert testimony established negligence on the part of Dr. Reid or Dr. Botticelli, the trial court ruled that the special verdict would only inquire as to the alleged negligence of Drs. Perchik and Dorff. The court noted:

> I listened very carefully for anything that would support putting Doctor Reid and Doctor Botticelli on the verdict . . . .. I thought we had reached a point where Doctor Reid and Doctor Botticelli were about to come in the case because it almost seemed like at that point that the plaintiff was . . . going to have

criticism of Doctor Dorff for things that Doctor Botticelli should have been doing . . .. And that to me was getting close. *But nobody, no witness stepped over the line here and said that either one of these gentlemen was negligent . . .. And the fact is that I think that's required.* I think that given the proper facts, you might be able to bootstrap it into the case, but I don't think it was done here . . .. I'll deny the request to put them on the verdict. [Emphasis added.]

The appellants renewed this issue on motions after verdict. The trial court confirmed its earlier ruling.

On appeal, Dr. Perchik and Dr. Dorff contend that, even though no witness expressly stated that Drs. Reid and Botticelli were negligent, ample evidence existed nevertheless to warrant the inclusion of the two physicians on the special verdict. We disagree.

While the *form* of a special verdict is addressed to the discretion of the trial court, *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 445, 280 N.W.2d 156, 160 (1979), the decision whether the special verdict shall inquire as to the alleged negligence of a non-party raises a question of law, namely whether evidence exists which warrants submission of the matter to the jury. *See Gierach v. Snap-On Tools Corp.,* 79 Wis. 2d 47, 55–57, 255 N.W.2d 465, 468–69 (1977). We review such question without deference to the trial court's ruling. *Walter v. Cessna Aircraft Co.,* 121 Wis. 2d 221, 231, 358 N.W.2d 816, 821 (Ct. App. 1984).

The appellants based their argument on *Connar v. West Shore Equipment, Inc.,* 68 Wis. 2d 42, 44–45, 227 N.W.2d 660, 662 (1975), which states that a jury must have the opportunity to consider the negligence of all who may have contributed to the tortious event. In *Con-*

*nar*, the supreme court described the quantum of evidence which mandates the inclusion of non-parties on the special verdict:

> Only one question must be affirmatively answered by the trial judge before submitting a negligence question to the jury: Is there evidence of conduct which, if believed by the jury, would constitute negligence on the part of the person or other legal entity inquired about.

*Id.* at 45, 227 N.W.2d at 662.

Arguing that the *Connar* test is satisfied, the appellants point to the testimony given by two of Susan's medical experts—Dr. W. Dudley Johnson and Dr. Jack Ferlinz. Both of these experts criticized the appellants' care of Susan. The appellants contend, however, that this expert evidence actually shows negligence not by them, but rather by Drs. Reid and Botticelli.

However, *Connar* did not involve allegations of professional negligence. *See id.* at 43–44, 227 N.W.2d at 661–62. The *Connar* standard, while applicable to any tort action, takes on a different look in the medical malpractice setting, for medical negligence *cannot* be established without expert testimony. *See, e.g., Kuehnemann v. Boyd,* 193 Wis. 588, 592, 214 N.W. 326, 327 (1927), *rev'd on other grounds, Fehrman v. Smirl,* 20 Wis. 2d 1, 21–22, 121 N.W.2d 255, 266 (1963); *Froh v. Milwaukee Medical Clinic,* 85 Wis. 2d 308, 317, 270 N.W.2d 83, 87 (Ct. App. 1978). Without expert testimony, the jury in a professional negligence case has no standard which enables it to determine whether a defendant failed to exercise the degree of care and skill required of the defendant. *Kuehnemann,* 193 Wis. at 592, 214 N.W. at 327.

455

██

Thus, as applied in this case, *Connar* required that an expert give an opinion to a reasonable degree of medical certainty that Drs. Reid and Botticelli were negligent before any question concerning their alleged negligence could be included on the special verdict. Because this evidence was not forthcoming, the trial court properly rejected the appellants' proposed special verdict questions.[4]

The appellants contend, however, that in certain of his deposition testimony which was read to the jury, Dr. Johnson did testify that Drs. Reid and Botticelli were negligent. This portion of Dr. Johnson's deposition testimony concerned Dr. Reid's and Dr. Botticelli's failure to perform a cardiac catheterization on Susan. The appellants reference Dr. Johnson's following testimony:

Q: So it's your opinion then that between their initial involvement in the case on August 2 for Dr. Reid, August 2 for Dr. Botticelli when he is contacted by Doctor Reid and August 3 when he takes over, that they failed to exercise reasonable care by not ordering a cardiac catheterization of Mrs. Zintek before the second MI [the second heart attack on August 7, 1985]?

A: No.

. . ..

---

[4]Thus, it is not enough for the appellants to reference that portion of the conflicting evidence which suggests that Dr. Reid—for whatever reason—did not examine Susan until some seven hours after she had been admitted to the hospital. Such evidence cannot satisfy *Connar v. West Shore Equipment, Inc.,* 68 Wis. 2d 42, 227 N.W.2d 660 (1975), even though it suggests that had Dr. Reid responded quickly, he could have conducted procedures which may have reduced the damage to Susan's heart.

Q: [counsel is reading from Dr. Johnson's deposition] "Do you have any criticisms of care provided by the cardiologist to Mrs. Zintek?"

A: "I think the patient should have been catheterized if not that night, certainly the next day or two, yes."

On the basis of this testimony, we cannot agree with the appellants' claim that "the record *plainly* establishes that . . . Drs. Reid and Botticelli were negligent." (Emphasis added.) While this exchange establishes Dr. Johnson's criticism of the care rendered to Susan, it does not establish Dr. Johnson's expert opinion that either Dr. Reid or Dr. Botticelli was *negligent.*[5] In a medical malpractice action, the relevant inquiry is not whether a physician has made a mistake; rather, the question is whether he or she was negligent. *Francois v. Mokrohisky,* 67 Wis. 2d 196, 201, 226 N.W.2d 470, 472 (1975). Evidence that another physician might have acted differently and that there were alternate procedures available is not, standing alone, evidence of medical negligence. *See id.*

The appellants persist, however, contending that their evidence "debunked plaintiffs' contention that Dr. Dorff was the 'captain of the ship' . . . and that all blame should be laid at his feet." Even were this true, the appellants' argument begs the question since, as we have already noted, no expert testimony established medical negligence on the part of Drs. Reid and Botticelli.

Moreover, we disagree with the appellants that their evidence implicated Drs. Reid and Botticelli equally in

---

[5]Thus, the trial court correctly noted that while this testimony was "getting close" to establishing negligence, it ultimately failed to do so.

the negligent treatment of Susan. True, Dr. Johnson testified that when a cardiologist is called into a case by an internist, the cardiologist is responsible for the management of the cardiac aspects of the patient's care until the case is "either returned to the internist or turned over to [a] surgeon." Likewise, Dr. Botticelli testified that while both he and Dr. Dorff supervised the residents and interns who assisted in Susan's treatment, he was in charge of her cardiac care.

However, Dr. Botticelli and Dr. Dorff both testified that if Dr. Botticelli was not present at a time when cardiac decisions had to be made, the decision fell to Dr. Dorff. On the morning of August 7, when Susan was given numerous medications to manage her second heart attack, only Dr. Dorff was present. These medications were administered *before* Dr. Botticelli arrived. Dr. Dorff noted in Susan's medical record his approval of these medications. According to Susan's expert, Dr. Ferlinz, the administration of these medications constituted medical negligence. This evidence supports, rather than "debunks," Susan's allegation of medical negligence against Dr. Dorff as the supervising physician. At the same time, this evidence negates, rather than supports, the appellants' claim that Dr. Botticelli was negligent.[6]

The trial court properly refused to include any questions concerning Dr. Reid and Dr. Botticelli on the special verdict.

## 2. STANDARD OF CARE

The appellants contend that the trial court did not properly instruct the jury regarding the standard of care to which the appellants should have been held.

---

[6]None of this evidence supports any claim of negligence against Dr. Reid.

Dr. Perchik is an emergency room physician; Dr. Dorff is an internist specializing in infectious diseases. Susan initially proposed standard instruction Wis J I—Civil 1023, which measured Dr. Perchik's and Dr. Dorff's alleged negligence by "[w]hether he failed to use the degree of care, skill, and judgment which is exercised *by the average specialist, in emergency medicine or cardiology.*"[7] (Emphasis added.)

The appellants proposed a tailored instruction, which, *inter alia,* omitted the phrase "*average specialist who practices emergency medicine and cardiology.*" (Emphasis added.) Instead, the appellants proposed language which measured their alleged negligence by whether they used "the degree of care, skill and judgment which is usually exercised in the same or similar circumstances by the *average physician who practices their* [sic] *respective discipline* at the time Susan Zintek was treated." (Emphasis added.) Thus, this instruction dispute between Susan and the appellants was drawn on

---

[7]Susan's full proposed instruction read:

In treating Susan Zintek, the Defendant doctors were required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances by the average specialist who practices emergency medicine and cardiology having due regard for the state of medical science at the time (plaintiff) was treated. The burden in this case is on (plaintiff) to prove that the doctors failed to conform to this standard.

A physician does not guarantee the results of his care and treatment. He must conform to the standard of reasonable care, but he is not liable for failing to use an extraordinary or utmost degree of care, skill, and judgment. A doctor cannot be found negligent simply because a bad result may have followed from his care and treatment. Medicine is not an exact science. Therefore, the issue you must decide in determining whether the doctors were negligent is not whether either doctor has made a mistake but rather whether he failed to use the degree of care, skill, and judgment which is exercised by the average specialist, in emergency medicine or cardiology.

two fronts: (1) whether the instructions should characterize the appellants as "average specialists" or "average physicians"; and (2) whether the instructions should allude to "cardiology" since neither Dr. Perchik nor Dr. Dorff is a cardiologist.

The trial court partially accommodated the appellants' concerns. The court modified the standard instruction to read "the degree of care, skill and judgment which is usually exercised in the same or similar circumstances by the *average physician* who renders emergency care and *treats cardiac patients*." (Emphasis added.)

After directing this change, the instruction was retyped and the court provided copies to all counsel. The court then read the changed text back to counsel. While the retyped version of the instruction incorporated the trial court's "average physician" amendment in the first paragraph, it unfortunately failed to do so in the second paragraph: the phrase "average specialist" remained. No one—trial court or counsel—noticed this oversight.[8]

"In evaluating instructions given to a jury, we recognize that the instructions are to be considered in their entirety." *State v. Paulson,* 106 Wis. 2d 96, 108, 315 N.W.2d 350, 356 (1982) (quoting *Moes v. State,* 91 Wis. 2d 756, 768, 284 N.W.2d 66, 72 (1979)). Moreover, an error within an instruction may be cured by a correct statement of the law elsewhere in the same instruction, *see id.,* if the overall meaning communicated was a correct statement of the law. *Leahy v. Kenosha Memorial Hosp.,* 118 Wis. 2d 441, 451, 348 N.W.2d 607, 613 (Ct. App. 1984). Only if the instruction is erroneous *and* misleads the jury will we conclude the misstatement con-

---

[8]The appellants did request a change in the retyped instruction on a matter not germane to this issue.

stitutes prejudicial error requiring reversal. *See id.* at 452, 348 N.W.2d at 613.[9]

Wisconsin law holds that a physician (general practitioner or specialist) is liable in an action for medical negligence if he or she fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he or she belongs, acting in the same or similar circumstances. *Shier v. Freedman,* 58 Wis. 2d 269, 283–84, 206 N.W.2d 166, 174, 208 N.W.2d 328 (1973). Thus, the instruction's second paragraph reference to "average specialist" in conjunction with "treatment of cardiac patients" was arguably erroneous. Nonetheless, we conclude that such error, taken in context, was not prejudicial to the appellants and thus does not warrant reversal of the judgment.[10]

We note three matters in particular on this question. First, the trial court correctly used the "average physician" language in the directly preceding paragraph. This reduced the risk that the jury was misled or tempted to apply an erroneous standard by the language in the second paragraph.

Second, neither the trial court nor trial counsel noticed the unintended reference to "average specialist"

---

[9]The Wisconsin Supreme Court has recently held that even where a jury is improperly instructed by language which creates a conclusive presumption as to an element of a criminal offense, a harmless error analysis is appropriate. *See State v. Kuntz,* 160 Wis. 2d 722, 739–40, 467 N.W.2d 531, 537–38 (1991).

[10]We reject Susan's argument that the appellants waived any objection to the ultimate instruction because they did not further object after the trial court made its modification to the standard instruction. The appellants' original proposed instruction adequately preserved their ability to raise the issues they argue on appeal.

in the second paragraph, even after viewing it on the typewritten page, hearing the trial court read it aloud at a hearing whose sole purpose was to scrutinize the instruction, and again hearing it read to the jury. Not until motions after verdict did the appellants pick up on this discrepancy. This demonstrates that the word "specialist" was neither so prominent nor so patently offensive that reversal is warranted.

Third, and most importantly, the instruction's aberrant language was an isolated mistake in a three-week trial. Counsels' opening statements did not cast the case in terms of Dr. Perchik or Dr. Dorff violating a cardiologist's standard of care. None of the expert witnesses testified that the standard of care violated by either Dr. Perchik or Dr. Dorff was that of the average cardiologist. Both counsel fashioned closing arguments which correctly stated the standard of care. Both counsel pointedly stated Dr. Perchik's and Dr. Dorff's respective specialties and that these were not cardiology. Furthermore, neither counsel argued to the jury that the appellants should be held to the standard of care required of cardiologists. We conclude that the instruction's isolated use of the word "specialist" did not obliterate in the jury's mind the correct standard of care of which the jury was repeatedly reminded during a three-week trial.[11]

---

[11]We also cannot agree with the appellants' argument that the case at bar is analogous to *Kerkman v. Hintz,* 142 Wis. 2d 404, 418 N.W.2d 795 (1988). There, the supreme court reversed and remanded for a new trial where the trial court had erroneously instructed the jury that a chiropractor is held to the same standard of care as a medical practitioner. *See id.* at 413, 418 N.W.2d at 799. *Kerkman* is inapplicable because, as we have stated, here there was no danger that the jury was confused or misled as to the appropriate standard of care to be applied.

## 3. SUPPLEMENTAL INSTRUCTIONS

The jury deliberated from approximately 8:00 p.m. to 10:00 p.m. on Thursday, November 9, 1989. The jury then retired for the evening and resumed their deliberations the following morning at 9:00 a.m. At approximately 1:30 p.m., the jury's foreperson sent a note to the trial court requesting "direction" because "[w]e have rehashed the questions over and over [and] cannot come to a consensus." The foreperson's note also contained a tally of the jurors' votes on the various questions. Understandably, this tally showed that the requisite number of jurors were not in agreement under the five-sixth's rule.

Susan asked that the trial court reinstruct the jury on the five-sixth's rule. The appellants objected, contending that such reinstruction might coerce a verdict. Although the court chose not to reinstruct on the five-sixth's rule, the court, over the appellants' objection, instructed the jury pursuant to Wis J I—Civil 195, "Supplemental Instruction Where Jury Is Unable To Agree." This instruction, derived from language in *Allen v. United States,* 164 U.S. 492 (1896), essentially encourages jurors to try to reach agreement if possible. The appellants do not directly challenge this instruction.

After four more hours of deliberation, the jury informed the trial court that it had reached a verdict. However, after reviewing the jury's verdict, the court concluded that the verdict still did not satisfy the five-sixth's rule. Over the appellants' objection, the court then reinstructed the jury on the five-sixth's rule. The court also denied the appellants' motion for a mistrial. Ten minutes later, the jury returned a verdict which the court approved under the five-sixth's rule.

On appeal, the appellants contend that the trial court's reinstruction of the jury on the five-sixth's rule on the heels of the *"Allen"* instruction coerced a verdict. The appellants apparently view the court's reinstruction on the five-sixth's rule as the equivalent of another *"Allen"* instruction because they cite to cases from other jurisdictions which hold that an *"Allen"* reinstruction is improper. *See, e.g., United States v. Seawell,* 550 F.2d 1159, 1163 (9th Cir. 1977).

Here, however, the trial court did not give an *"Allen"* reinstruction; it gave a five-sixth's reinstruction. Section 805.13(5), Stats., expressly authorizes the trial court to reinstruct the jury as to all or any part of the instructions previously given or to give supplementary instructions as it deems appropriate. This decision rests in the sound discretion of the trial court. *Hareng v. Blanke,* 90 Wis. 2d 158, 166, 279 N.W.2d 437, 441 (1979). In addition, the supreme court has directed that when a jury returns a verdict which is defective under the five-sixth's rule, the proper procedure is for the court to reinstruct the jury and then direct it to continue its deliberations. *See Bensend v. Harper,* 2 Wis. 2d 474, 478–79, 87 N.W.2d 258, 260–61 (1958). The trial court here properly followed this procedure.[12] The supplemen-

---

[12]We also reject the appellants' argument that the trial court's additional remarks explaining the five-sixth's rule coerced the jury. The court said, in part:

> We've got ten cups like this with somebody's name on it. Ten of those have to be on one side of the question or the other and they have to be the same ten cups. Now you can have the two other cups on either side on other things, but the same ten cups have to be there for each answer made.

The court's "ten cups" analogy simply explained the workings of the five-sixth's rule. The court did not tell the jury that it *had to*

tal instructions did not coerce a verdict.

Alternatively, we conclude that even if the trial court's reinstruction under the five-sixth's rule was error, such was harmless because the jury's original verdict did not violate the five-sixth's rule.

The jury's original verdict carried the following dissents:

> As to Dr. Perchik:
> Juror A as to negligence;
> Juror C as to causation;
> As to Dr. Dorff:
> Juror B as to negligence;
> Juror A as to causation.

The five-sixth's rule requires not that five-sixth's of the jury agree on *all questions* in the verdict, but rather that this number agree on all questions necessary to support a judgment on a particular claim. *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 401, 331 N.W.2d 585, 590 (1983). Dissents important to one claim may be immaterial to another when the verdict is reviewed in this fashion. *Id.* Thus, a five-sixth's analysis is not governed merely by the number of dissenting votes, but rather how the affirmative votes distribute themselves across the various questions necessary to support a judgment on a particular claim.

Applying this law, we conclude that the jury's original verdict satisfied the five-sixth's rule. At least ten

*agree.* To the contrary, the court had previously told the jury when delivering the "*Allen*" instruction that "[t]he court is not suggesting to any of you that you surrender conscientious convictions of what the truth is, and the weight and effect of all the evidence." Wis J I—Civil 195.

jurors found Dr. Perchik negligent. These same ten jurors found Dr. Perchik's negligence causal. These same ten jurors apportioned Dr. Perchik's comparative negligence at 40%. These same ten jurors agreed to all the damage questions. These answers supplied the necessary underpinning to support a judgment on Susan's claim against Dr. Perchik.

The same is true with respect to Dr. Dorff, although not exactly with the same ten jurors who agreed as to Dr. Perchik. These answers supplied the necessary underpinning to support a judgment on Susan's claim against Dr. Dorff.[13]

The appellants claim that this separate five-sixth's application with different combinations of jurors as to each defendant is inappropriate because Susan stated joint tortfeasor claims against them. Susan responds that her claims against Dr. Perchik and Dr. Dorff stated separate and successive—not joint tortfeasor—claims.

Interesting as this debate is, it is also irrelevant. We know of no law which holds that application of the five-

---

[13]We have considered whether the respective dissents of Jurors A, B, and C from only one—not both—of the liability questions (negligence or causation) is inconsistent. For instance, does Juror A's dissent from Dr. Perchik's negligence logically require a dissent to whether Dr. Perchik's was causal? Assuming this to be so, and gratuitously assigning dissenting votes in accord with such assumption, the breakdown of the verdict would be as follows:

> As to Dr. Perchik:
> Juror A as to negligence *and* causation;
> Juror C as to negligence *and* causation;
> As to Dr. Dorff:
> Juror A as to negligence *and* causation;
> Juror B as to negligence *and* causation.

Under this scenario, the verdict still satisfies the five-sixth's rule. Only two jurors dissent as to Dr. Perchik; likewise as to Dr. Dorff.

sixth's rule is different depending on whether the multiple defendants' liability is premised upon joint or several liability principles. In either case, the relevant inquiry is the same: whether the requisite number of jurors have agreed on all questions necessary to support a judgment on a claim against a given defendant. *Giese,* 111 Wis. 2d at 401, 331 N.W.2d at 590. The jury's original verdict in this case satisfied the five-sixth's rule.

## 4. "INFORMAL, EX PARTE" DISCOVERY

During discovery, the appellants submitted "Informed Consent To Disclosure of Health Care Information" authorization forms to Susan's counsel for her signature. These authorizations would have allowed the appellants' counsel to conduct informal, *ex parte* discovery discussions with Susan's treating physicians. The authorizations contained the following language directed to Susan's physicians:

> You may not disclose to any person any confidential communications made or information obtained or disseminated for purposes of your diagnosis or treatment of Ms. Zintek's physical, mental or emotional condition. However, you may, if requested, discuss your opinions regarding the care rendered to Ms. Zintek by other physicians, including the defendants in this lawsuit.

Susan refused to sign the authorizations. The appellants moved the trial court to compel her to do so. The court denied this request. The appellants filed a petition for leave to appeal this non-final order with this court. We denied the petition, resting our decision principally on *State ex rel. Klieger v. Alby,* 125 Wis. 2d 468, 373 N.W.2d 57 (Ct. App. 1985). There, the court of appeals

ruled that while a court may compel and limit discovery, an informal private conference is not within the scope of discovery and a court cannot order a plaintiff to submit to such informal discovery. *Id.* at 473, 373 N.W.2d at 60.

Now, on direct appeal, the appellants again assert that the trial court erred in refusing to compel Susan to execute the releases. Again we conclude that *Klieger* controls and that the trial court properly denied the appellants' motion to compel.

■■■

*Klieger* holds that a plaintiff, by filing a medical malpractice action, does not automatically waive the physician-patient privilege outlined in sec. 905.04, Stats., so as to permit the trial court to order informal conferences over plaintiff's objections. *Klieger,* 125 Wis. 2d at 473–74, 373 N.W.2d at 60. The appellants argue that *Klieger* is wrongly decided in that it "is premised on an erroneous interpretation of the physician/patient privilege." The appellants also contend *Klieger* is distinguishable.

Section 905.04(2), Stats., provides that a patient may refuse to disclose, or prevent others from disclosing, communications between the patient and his or her physician made for the purpose of diagnosis or treatment of the patient by the physician. This privilege is not, however, absolute. Section 905.04(4)(c) provides that:

> There is no privilege under this section as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient in any proceedings in which he [or she] relies upon the condition as an element of his [or her] claim or defense.

Regarding whether *Klieger* was wrongly decided, we make a single observation: *Klieger* is a published deci-

sion of this court and is thus the law until such time we or the supreme court hold to the contrary. We decline the appellants' invitation to reconsider *Klieger*.

The appellants next argue that *Klieger* is inapplicable because the *Klieger* defendants sought privileged information from the patient's current treating physician about the current treatment. Here, the appellants note that they seek only to speak with Susan's treating physicians regarding Susan's care at the hands *of the defendants and other physicians.*

We reject the appellants' claim that this distinction renders *Klieger* inapplicable. Regardless of the differing reach of the authorizations in *Klieger* and those here, the rule of *Klieger* is clear: "If the court orders private conferences outside the scope of discovery, the patient loses control of the privilege, a result the statutes clearly do not contemplate." *Klieger,* 125 Wis. 2d at 474, 373 N.W.2d at 61. Under the appellants' proposed rule, a patient loses control of the privilege. While we are confident that the appellants' counsel would adhere to the letter and spirit of the authorizations, the appellants' proposed rule creates an honor system rather than one controlled by the patient and rules of law. We choose not to adopt a rule which so trammels, undetected, a plaintiff's exercise of his or her privilege.

## 5. TAXATION OF COSTS

Section 814.01(1), Stats., provides that "[e]xcept as otherwise provided in this chapter [chapter 814, Court Costs and Fees], costs shall be allowed of course to the plaintiff upon a recovery." Section 814.04, Stats., outlines the range of cost items typically awarded to a prevailing plaintiff, pursuant to the directive of sec. 814.01(1).

Accordingly, Susan prepared a bill of costs. The appellants challenged certain of these items. The parties submitted briefs, and the trial court conducted a hearing on this question.[14] After the hearing, the appellants and Susan each prepared a written summary of their respective positions on this question. In a "Decision and Order" dated June 29, 1990, the court denied the appellants' challenges and directed that Susan's costs were allowed pursuant to her request. The appellants renew certain of their challenges on appeal.

We first note that the right to recover costs is not synonymous with the right to recover the expenses of litigation. *State v. Amato,* 126 Wis. 2d 212, 217, 376 N.W.2d 75, 78 (Ct. App. 1985). Such right is statutory in nature, and to the extent that the statutes do not authorize the recovery of specific costs, they are not recoverable. *Id.*[15]

### a. Attorney's Fees

Section 814.04(1), Stats., provides, in relevant part, that "[w]hen the amount recovered [by the prevailing party in litigation] . . . is $1,000 or over, attorney fees shall be $100 . . . .." In the case at bar, the six plaintiffs each requested $100. The trial court granted this request, awarding a total of $600 in statutory attorney's fees. The appellants contend that the proper award is $100, to be divided *among* the six plaintiffs.

---

[14]The appellate record does not include a transcript of this hearing.

[15]However, a request for costs under the omnibus costs statute, sec. 814.036, Stats., is addressed to the trial court's discretion. *See also Gallagher v. Schernecker,* 60 Wis. 2d 143, 150, 208 N.W.2d 437, 441 (1973).

The trial court apparently relied upon *Gospodar v. Milwaukee Auto. Ins. Co.,* 249 Wis. 332, 24 N.W.2d 676, 25 N.W.2d 257 (1946), when awarding the multiple plaintiffs separate statutory attorney's fees. *Gospodar* involved a suit brought by three women and their respective husbands arising out of a collision between a snowplow and an automobile. The three women sustained personal injuries when the car in which they were riding was struck by the snowplow. The men were not involved in the accident, but sued for loss of consortium. *See id.* at 333–39a, 24 N.W.2d at 676–79.

The supreme court upheld an award of attorney's fees to each of the six *Gospodar* plaintiffs, ruling that where multiple plaintiffs consolidate their respective causes of action in a single complaint, each plaintiff may recover costs as if he or she had brought suit individually. *See Gospodar,* 249 Wis. at 339, 24 N.W.2d at 679. The supreme court reasoned that were it to

> hold that they cannot do so [each collect attorney's fees] by joining in the same complaint would necessarily mean that in the future separate causes of action would be commenced . . . "in direct conflict with modern court procedure to reduce multiplicity of suits and it cannot be held that the end result of the statutes on costs is to encourage and promote a multiplicity of actions in order that greater costs may be thereby obtained."

*Id.* at 339–39a, 24 N.W.2d at 679 (quoting the trial court).

The appellants argue that because the compulsory joinder statute, sec. 803.03(2), Stats., *requires* joinder of all derivative and subrogated claims springing from a principal claim, *Gospodar* does not control this case. The

appellants argue, in essence, that the *Gospodar* holding has been narrowed by the subsequent enactment of the compulsory joinder statute. *See* Wisconsin Rules of Civil Procedure, S. Ct. Order, 67 Wis. 2d 643. We disagree.

The compulsory joinder statute, sec. 803.03(2), Stats., states, in relevant part:

> CLAIMS ARISING BY SUBROGATION, DERIVATION AND ASSIGNMENT. (a) *Joinder of related claims.* A party asserting a claim for affirmative relief shall join as parties to the action all persons who at the commencement of the action have claims based upon subrogation to the rights of the party asserting the principal claim, derivation from the principal claim, or assignment of part of the principal claim. [Emphasis in original.]

The appellants confuse what sec. 803.03(2), Stats., says with what it does not say. Section 803.03(2) says that subrogated and derivative plaintiffs cannot bring separate *actions*. However, the statute does not say such plaintiffs no longer have separate *claims*. The compulsory joinder statute simply compels subrogated and derivative plaintiffs to do what the *Gospodar* plaintiffs chose to do. Thus, the *Gospodar* holding is applicable to the case at bar. The trial court correctly awarded separate statutory attorney's fees to the multiple plaintiffs.

### b. Disbursements
### (1) Photographic Expenses

The trial court also awarded Susan $788.39 for photographic expenses. The appellants argue that sec. 814.04(2), Stats., which governs disbursements, prohib-

its Susan from recouping these expenses.[16]

The appellants contend that although the statute allows a recovery to plaintiffs "not exceeding $50 for each item [photographs], "*Billingsley v. Zickert,* 72 Wis. 2d 156, 168–69, 240 N.W.2d 375, 381–82 (1976), teaches that "each item" means each item actually used at trial.[17] The appellants contend that Susan was not entitled to all of her photographic costs because she did not use all the photographs *at trial.*

We disagree that *Billingsley* controls the issue before us. In *Billingsley,* the plaintiffs used "[n]umerous photographs . . . in presenting their case." *Id.* at 168–69, 240 N.W.2d at 381. The trial court refused to interpret the disbursement statute as allowing plaintiffs $50 for each photograph used on the grounds that such an interpretation "would allow a party to 'run up' costs." *Id.* at 169, 240 N.W.2d at 382. The supreme court

---

[16]Section 814.04(2), Stats., empowers the trial court to award the prevailing party in litigation:

> All the necessary disbursements and fees allowed by law; the compensation of referees; a reasonable disbursement for the service of process or other papers in an action when the same are served by a person authorized by law other than an officer, but the item may not exceed the authorized sheriff's fee for the same service; amounts actually paid out for certified copies of papers and records in any public office; postage, telegraphing, telephoning and express; depositions including copies; plats and photographs, not exceeding $50 for each item; an expert witness fee not exceeding $100 for each expert who testifies, exclusive of the standard witness fee and mileage which shall also be taxed for each expert; and in actions relating to or affecting the title to lands, the cost of procuring an abstract of title to lands. Guardian ad litem fees shall not be taxed as a cost or disbursement.

[17]The disbursement statute discussed in *Billingsley v. Zickert,* 72 Wis. 2d 156, 168–69, 240 N.W.2d 375, 381–82 (1976), was sec. 271.04(2), Stats. (1971–72), a predecessor statute to the present sec. 814.04(2), Stats.

473

reversed, reasoning that such expenses are both self-limiting and within the plain meaning of the statute: "Since the proponents of an exhibit are aware that its cost will have to be borne by themselves if their case is unsuccessful, self-restraint is induced. Exhibits are for jury illumination and the statute expressly allows cost recovery for each item." *Id.*

The appellants apparently read the "exhibits are for jury illumination" language as representing supreme court approval of awarding reimbursement only for photographs used at trial. What this reading overlooks, however, is that the *Billingsley* court was not asked to assess the propriety of costs for photographs *not* used at trial.

Section 814.04(2), Stats., does not impose a requirement that an item be used at trial before disbursement recovery is permitted. We note that, in the very same subsection, the legislature chose to impose a qualifier as to expert witnesses; such a witness must testify before disbursement recovery is allowed. Section 814.04(2). The legislature could easily have stated a qualifier for "item"-related disbursements. It did not. The legislative intent is clear.

### (2) Expert Witness Fees

The trial court also awarded Susan $300 for expert witness fees. The appellants challenge these awards, arguing that the statute does not embrace these costs.

The appellants are clearly wrong. Section 814.04(2), Stats., expressly recognizes a statutory fee for each expert witness who testifies.[18]

---

[18]In the trial court, the appellants argued that the award of statutory costs for these expert witnesses was improper because they testified only at deposition—not trial. This issue, however, is not renewed on appeal.

### (3) Other Miscellaneous Expenses

The trial court also awarded Susan $192 for pathological slides, $3892.13 for photocopies, and $457.61 for copies of medical treatises.[19]

The appellants contend that these awards are improper under our decision in *J.F. Ahern Co. v. Wisconsin State Building Commission,* 114 Wis. 2d 69, 109, 336 N.W.2d 679, 698 (Ct. App. 1983). In *Ahern,* the defendants—the prevailing party in the trial court—argued on appeal that the language "adverse examinations including copies," *see* sec. 814.04(2), Stats. (1979–80), should be construed to allow the recovery of all adverse examination costs, including examinations which were not adverse to them. This court disagreed, reasoning "[t]o the extent that a statute does not authorize the recovery of specific costs, they are not recoverable." *Ahern,* 114 Wis. 2d at 109, 336 N.W.2d at 698. The appellants here seize upon this language, arguing that because the present version of sec. 814.04(2) does not employ the terms "photocopies," "pathological slides" or "medical treatises," such expenses are not "specifically" authorized and hence not recoverable.

The appellants read our language in *Ahern* out of context. In *Ahern,* the disputed disbursement item—costs for adverse examinations—was *expressly* covered by the costs statute then in effect, sec. 814.04(2), Stats. (1979–80). We noted that the statute required that the examination be adverse to the party claiming the

---

[19]In the trial court, the appellants raised this claim only with respect to the photocopying fees—not the pathological slides and copies of the medical treatises. However, since the same analysis of this issue applies to all three items, we choose not to invoke waiver against the appellants.

475

costs. *Ahern,* 114 Wis. 2d at 109, 336 N.W.2d at 698. Since the examinations were not adverse, we ruled that the defendants were not entitled to recoup this cost. *Id.* Thus, our discussion of "specifically" authorized expenses addressed what was included within a specific statutory reference. Here the situation is different because these miscellaneous items at issue are not expressly recited in sec. 814.04(2), Stats. *Ahern* does not govern here.

We thus turn to the statute. Although the items in dispute are not among those items expressly recited in sec. 814.04, Stats., the statute also contains a "catch-all" provision. The statute mandates costs to a prevailing plaintiff for "[a]ll the necessary disbursements and fees allowed by law . . .." Section 814.04(2). Among the costs "allowed by law" are those covered by the omnibus costs statute, sec. 814.036, Stats.: "If a situation arises in which the allowance of costs is not covered by ss. 814.01 to 814.035, the allowance shall be in the discretion of the court."[20]

We conclude that the interplay between the "catch-all" provision of sec. 814.04(2), Stats., and the omnibus costs provision of sec. 814.036, Stats., justifies the award of the miscellaneous costs in this case.

Although the parties' trial briefs on this question did not address the interplay between these two statutes, Susan did argue that the awarding of these miscellaneous costs was proper under the "all necessary disburse-

---

[20]The omnibus costs statute, sec. 814.036, Stats., also applies to situations arising under the disbursements statute, sec. 814.04(2), Stats., as sec. 814.04 is "the general costs *and* disbursements statute," *Thomas v. Iowa Nat'l Mut. Ins. Co.,* 132 Wis. 2d 18, 22, 390 N.W.2d 572, 574 (Ct. App. 1986) (emphasis added), and the word "costs" includes disbursements. *Id.* at 23, 390 N.W.2d at 574.

ments" language of sec. 814.04(2), Stats. The trial court's order adopted by reference Susan's position and authorities on this dispute. Although the court did not expressly invoke the omnibus cost statute, the court's adoption of Susan's "all necessary disbursements" argument under sec. 814.04(2) amounted to essentially the same exercise if performed under the omnibus statute.

The appellants fear that our construction creates the potential for an unfettered award of costs. We disagree. The omnibus statute expressly provides that the awarding of costs not specifically otherwise provided is committed to the trial court's discretion. Section 814.036, Stats. Thus, abuse of discretion perimeters will control any potential for abuse.

Here, although the appellants complain about lack of documentation regarding certain of these disbursements, they point to no abuse of discretion. The trial court presided for many months over this long and complicated case. The trial court is obviously much better qualified than we to judge which of Susan's disbursements were "necessary" to the prosecution of her action. We conclude the trial court properly allowed these miscellaneous items of costs to Susan.

c. Interest on the Verdict

The appellants object to Susan receiving 12% interest on the verdict pursuant to sec. 814.04(4), Stats.,[21] on the grounds that it is "unfair, usurious and in violation of substantive due process." More particularly, the

[21]Section 814.04(4), Stats., states as follows:

INTEREST ON VERDICT. Except as provided in s. 807.01(4), if the judgment is for the recovery of money, interest at the rate of 12% per year from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs.

appellants contend the statutory rate of interest is usurious because prevailing market rates of return on investments are currently well below 12%, thus effectively causing the statutory rate to operate as overcompensation to Susan and as a penalty against the appellants. *See Nelson v. Travelers Ins. Co.,* 102 Wis. 2d 159, 169, 306 N.W.2d 71, 76 (1981).

Usury is interest upon a loan or forbearance in excess of that permitted by law. *Mortgage Assocs., Inc. v. Siverhus,* 63 Wis. 2d 650, 656, 218 N.W.2d 266, 269 (1974). The maximum rate of interest allowed by Wisconsin law is 12%. Section 138.05, Stats. We conclude, therefore, that as a matter of law, the 12% interest rate permitted by sec. 814.04(4), Stats., is not usurious, for it equals rather than exceeds the maximum rate allowed by the usury statute, sec. 138.05. Susan correctly observes that the appellants' concern on this issue is more properly addressed to the legislature.

Regarding the constitutionality of sec. 814.04(4), Stats., the appellants proffer a similar argument. Specifically, they claim that the legislature's choice of 12% as the rate of interest on verdicts is "arbitrary and unreasonable" because it "bears no rational relationship to the interest a plaintiff might actually earn on a judgment, and it is contrary to [sec.] 814.04(4)'s [compensatory] purpose."

The constitutionality of a statute is a question of law which we review *de novo. Hasselblad v. City of Green Bay,* 145 Wis. 2d 439, 442, 427 N.W.2d 140, 141 (Ct. App. 1988). There is a strong presumption in favor of a statute's constitutionality, and, if possible, we will interpret a statute to preserve it. *State v. Hurd,* 135 Wis. 2d 266, 271, 400 N.W.2d 42, 44 (Ct. App. 1986). In addition,

the party challenging the constitutionality of a statute bears the burden to show its invalidity beyond a reasonable doubt. *State v. Dennis,* 138 Wis. 2d 99, 103, 405 N.W.2d 711, 713 (Ct. App. 1987).

We conclude that the appellants have not met their burden on this claim. It does not necessarily follow that the only "rational" interest rate is one which is in virtual lock-step with every fluctuation in market conditions.

A fundamental precept justifying an award of interest is to compensate a plaintiff for the forbearance of the income-producing ability of money due. *See Nelson,* 102 Wis. 2d at 169, 306 N.W.2d at 76. The award of interest on the verdict in this case clearly serves this purpose.

In addition, the accumulation of interest on an unpaid obligation can also serve to motivate the debtor to pay. This is not punishment, *see id.,* but incentive. A non-usurious interest rate above the prevailing market rate is a rational means of providing such an incentive. The appellants have not convinced us that sec. 814.04(4), Stats., which prescribes 12% interest on a verdict, does not rationally serve the purpose for allowing interest on verdicts. Section 814.04(4) is not unconstitutional.

## 6. PAST WAGE LOSS

The jury awarded Susan $200,000 for loss of past earning capacity. The trial court upheld this award on motions after verdict, rejecting the appellants' argument that the award was not supported by the evidence and was excessive. The appellants pursue this claim on appeal.

The amount of damages awarded is a matter resting largely in the jury's discretion. *Brogan v. Industrial Casualty Ins. Co.,* 132 Wis. 2d 229, 238, 392 N.W.2d 439, 443 (Ct. App. 1986). The amount of damages is for the jury to decide, and where the trial court has approved a damage award over a claim of excessiveness, the issue on appeal is whether "there is any credible evidence that under any reasonable view supports the verdict and removes the issue from the realm of conjecture." *White v. General Casualty Co.,* 118 Wis. 2d 433, 440, 348 N.W.2d 614, 618 (Ct. App. 1984) (quoting *Coryell v. Conn,* 88 Wis. 2d 310, 315, 276 N.W.2d 723, 726 (1979)). A verdict that has the trial court's approval will be viewed with particular favor on appeal, provided that the trial court analyzed the evidence underlying the verdict and that such analysis appears in the trial court's decision. *Brogan,* 132 Wis. 2d at 238, 392 N.W.2d at 443.

Here, however, the appellants have failed to provide us with a transcript of the trial court's bench ruling denying their motions after verdict. When an appeal is brought upon an incomplete record, this court will assume that every fact essential to sustain the trial court's decision is supported by the record. *D.L. v. Huebner,* 110 Wis. 2d 581, 597, 329 N.W.2d 890, 897 (1983). On this basis, we affirm the trial court's ruling that the verdict is not excessive and deny the appellants a new trial on the issue of damages.

As to the sufficiency of the evidence to support the jury's damage award, as we have already noted, we view the evidence in a light most favorable to the verdict. *Meurer,* 90 Wis. 2d at 450, 280 N.W.2d at 162. We conclude the evidence is supportive of the award.

The jury awarded Susan $200,000 for past wage loss. Susan established her past wage loss through the testimony of Dr. Robert Niendorf, an economic expert. Dr. Niendorf testified that Susan's lost wages totaled $168,344. From this, the appellants reason that the evidence does not support the jury's $200,000 award.

The appellants overlook, however, the complete record on this issue. Dr. Niendorf also gave testimony concerning the value of household services which Susan would normally have performed had she not been injured. Dr. Niendorf valued this loss at $50,176. As with the past wage loss figure, the appellants did not offer any evidence to rebut Dr. Niendorf's valuation.

In his closing argument, Susan's counsel stated that household services are "part of Sue's earning capacity." Counsel then told the jury "what you have to do on the verdict is where it asks for past loss of earning capacity, you need to total this 50,000 with this 168. That's an earning capacity loss in the past of 218,000 . . .." The jury's past wage loss award falls some $18,000 *short* of the sum of these two figures. Thus, this award is well supported by the evidence and certainly is not excessive.[22]

### 7. DISABILITY BENEFITS

Before the events giving rise to this action, Susan was employed by Northwestern Mutual Life Insurance as a department supervisor. Susan has not returned to

---

[22]We address this issue as the appellants have framed it—sufficiency of the evidence. We do not, thus, address a possibly more nettlesome question: whether *Susan* may collect for loss of household services where the jury was instructed regarding *Arthur's* loss of consortium and responded by awarding Arthur damages for "loss of society and companionship."

work, and she presented evidence that she is unemployable. One of the appellants' experts testified that Susan is able to work. The jury awarded Susan $750,000 for loss of future earning capacity.

Here on appeal, the appellants assert that the trial court improperly applied the collateral source rule when it refused to allow evidence of Susan's receipt of long-term disability benefits. *See generally Payne v. Bilco Co.*, 54 Wis. 2d 424, 433, 195 N.W.2d 641, 647 (1972). The appellants claim the collateral source rule does not apply in this case because the disputed evidence falls under an impeachment exception to the rule noted in *Hack v. State Farm Mut. Auto. Ins. Co.*, 37 Wis. 2d 1, 10, 154 N.W.2d 320, 325 (1967). More particularly, the appellants claim that the evidence bears on Susan's "motivation to return to work."

However, we are unable to address this issue on the merits. The appellants do not refer us to any portion of this voluminous record wherein the trial court's ruling and reasoning may be found. Nor do they cite to that portion of the record where the requisite motion or objections to the admission of collateral source evidence may have been made. While this court has sometimes (perhaps ill-advisedly) performed counsel's task in this regard, we choose not to do so in this case in which the record is vast and we are not given the slightest clue where to find the relevant material.[23] It is not the duty of

---

[23]Nonetheless, we have conducted a limited foray into the record. We did locate the appellants' reference to this putative evidence in their trial brief and Susan's objection in her motion *in limine.* But to the extent the trial court's ruling was memorialized in any of the typical and expected places—hearing on motions *in limine;* trial testimony by Susan, Arthur, Susan's employer, or Susan's economic expert—we were unable to find it.

an appellate court to sift and glean the record *in extenso* to find facts to support an alleged error. *Keplin v. Hardware Mut. Casualty Co.,* 24 Wis. 2d 319, 324, 129 N.W.2d 321, 323 (1964). We therefore do not address this issue on the merits.

## 8. NEW TRIAL IN THE INTEREST OF JUSTICE

For their final argument, the appellants assert that the trial court erred in refusing to grant their motion for a new trial in the interest of justice pursuant to sec. 805.15(1), Stats. In support of this contention, the appellants reference the cumulative weight of the issues previously raised in this appeal. In light of our foregoing discussion, it cannot be said that the trial court abused its discretion in denying the appellants' motion for a new trial. *See Priske v. General Motors Corp.,* 89 Wis. 2d 642, 662-63, 279 N.W.2d 227, 236 (1979).

We affirm the judgment and order of the trial court in all respects.

*By the Court.*—Judgment and order affirmed.

---

The primary responsibility to provide such record references falls upon the shoulders of the party seeking to overturn the ruling, *see* sec. 809.19(1)(e), Stats. Accordingly, we decline to venture further.