Peggy PAULSON, Douglas Paulson, husband and wife, and Michelle Wagner, a minor, by her guardian ad litem, Jim Schernecker, Plaintiffs-Appellants,

v.

ALLSTATE INSURANCE COMPANY and Cheryl Schacht, Defendants-Respondents,†

GROUP HEALTH COOPERATIVE OF SOUTH CENTRAL WISCONSIN, Subrogated-Defendant.

Court of Appeals

*No. 01–0991. Submitted on briefs November 8, 2001.—Decided June 27, 2002.*

2002 WI App 168

(Also reported in 649 N.W.2d 645.)

† Petition to review granted 9-26-02.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Jim Schernecker* of *Action Law, S.C.*, Madison.

On behalf of the defendant-respondent Allstate Insurance Company, the cause was submitted on the brief of *Richard G. Niess* and *David P. Renovitch* of *Coyne, Niess, Schultz, Becker & Bauer, S.C.*, Madison.

Before Dykman, Roggensack and Lundsten, JJ.

¶ 1. LUNDSTEN, J. In 1998, a car driven by Cheryl Schacht collided with a car driven by Peggy Paulson. Paulson, her husband, Douglas Paulson, and her daughter, Michelle Wagner (collectively, the Paulsons), sued Schacht and Schacht's insurer, Allstate Insurance Company. The circuit court found Allstate in default on liability and the case was tried to the court

solely on damages. Although the circuit court awarded damages to the Paulsons, it also prohibited the Paulsons from presenting evidence showing, what the Paulsons contend was, the full extent of their property damages. The Paulsons appeal.

¶ 2. This case involves three general topics, each with sub-issues: (1) whether the circuit court erred when refusing the Paulsons' request for relief under WIS. STAT. §§ 802.05 and 814.025 (1997–98),[1] based on the Paulsons' assertion that Allstate filed frivolous motions and sham affidavits; (2) whether the collateral source rule, principles of subrogation, and evidentiary rules support the circuit court's decision to limit evidence of property damages; and (3) whether the circuit court erred when awarding costs to each of the three prevailing plaintiffs under WIS. STAT. § 814.04(2). Because these are distinct topics, we provide separate factual backgrounds and discussions for each. We affirm in part, reverse in part, and remand.

*I. Request for Sanctions under* WIS. STAT. *§§ 802.05 and 814.025*

*A. Background*

¶ 3. In October 1999, the Paulsons brought suit against Schacht and Allstate. The Paulsons served Allstate's registered agent for service, CT Corporation Systems, on October 27, 1999. CT Corporation transmitted the summons and complaint to Allstate employee Terry Darling, who received it at Allstate's Brookfield claims office the next day.

¶ 4. Both Schacht and Allstate were represented throughout by Coyne, Niess, Schultz, Becker & Bauer.

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

The firm filed Schacht's answer, but did not file an answer on behalf of Allstate.

¶ 5. About eight months after Allstate's answer was due, Attorney Laura Whipple of Coyne, Niess, Schultz, Becker & Bauer moved for dismissal of all claims against Allstate, asserting insufficiency of service of the summons and complaint. Counsel representing the Paulsons responded by attempting to get information from CT Corporation regarding service. After several days, Attorney Whipple telephoned the Paulsons' counsel and told him she had learned that Allstate was properly served through CT Corporation. Seven days after moving to dismiss claims against Allstate, Attorney Whipple withdrew the motion.

¶ 6. Attorney Whipple then filed Allstate's answer to the complaint, and Paulsons' counsel immediately moved to strike the answer as untimely. Attorney· Whipple moved to enlarge time to answer, alleging that Allstate's failure to answer within the statutory time period was the result of excusable neglect. In a supporting memorandum, Attorney Whipple asserted that Allstate believed it had not been served with the summons and complaint. Attorney Whipple conceded that Allstate's registered agent, CT Corporation Systems, had been properly served. However, she alleged that CT Corporation erred by sending the summons and complaint to the wrong Allstate office and that, consequently, the appropriate Allstate claims office, the Brookfield office, had no record of receipt of the summons and complaint. An attached affidavit of Tammy Bellefeuille, an employee of CT Corporation, asserted that CT Corporation addressed the summons and complaint to an Allstate office in a different state. In a second affidavit, Jackie Christiansen, an Allstate claims representative in its Brookfield office, asserted that the

Brookfield office had no record of ever receiving the Paulson summons and complaint.

¶ 7. Thereafter, the Paulsons deposed Bellefeuille; Christiansen; Roger Gierhart, a supervisor of CT Corporation; and Annie Brink, an employee of Allstate. These depositions revealed that, regardless of any error regarding an address, CT Corporation successfully transmitted the Paulson summons and complaint to Terry Darling at Allstate's Brookfield office. Annie Brink's deposition revealed that Allstate's own records indicated that Darling received the summons and complaint from CT Corporation in October of 1999.

¶ 8. The Paulsons moved for default judgment against Allstate and moved for an order finding that Allstate submitted "sham" affidavits. In a supporting memorandum, the Paulsons asserted that Allstate submitted affidavits containing false information in support of its motion to enlarge time to answer and that Allstate's motion to dismiss all claims against Allstate was "frivolous." At a subsequent hearing, the Paulsons argued that Allstate's motion to dismiss was baseless, in violation of WIS. STAT. §§ 802.05 and 814.025. The Paulsons also argued that the affidavits supporting Allstate's motion to enlarge time contained factually unfounded statements not made in good faith, in violation of § 802.05.

¶ 9. The circuit court granted the Paulsons' motion for default judgment against Allstate with respect to liability, but denied the Paulsons' request for sanctions under WIS. STAT. §§ 802.05 and 814.025. The court explained its latter rulings by explaining that Attorney Whipple had not engaged in conduct that was "in any way unethical or inappropriate or a violation of the statute."

### B. Discussion

¶ 10. The Paulsons contend the circuit court erred when it declined to sanction Allstate under WIS. STAT. §§ 802.05 and 814.025. As explained below, we remand for reconsideration of sanctions because we conclude the circuit court applied an erroneous legal standard.

¶ 11. Allstate argues that the Paulsons raise this issue for the first time on appeal, and therefore have waived it. Allstate contends that, although the Paulsons' counsel argued before the circuit court that "affirmative" defenses were frivolous, counsel "*never* sought an order from the trial court sanctioning, as frivolous, Cheryl Schacht's motion to dismiss under § 814.025 and § 802.05, Stats." However, the record shows that the Paulsons' counsel requested relief under WIS. STAT. §§ 802.05 and 814.025 with respect to the affidavits and motions. Accordingly, we turn to the merits of the Paulsons' challenge.[2]

¶ 12. A decision to award attorney fees under WIS. STAT. §§ 802.05 and 814.025(3)(b) is discretionary. *See Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 546–49, 597 N.W.2d 744 (1999). We will sustain a discretionary act if we conclude the circuit court examined the relevant facts, applied a proper standard of law, and,

---

[2] At one point in its appellate brief, Allstate seems to argue that it should not be sanctioned for the motion to dismiss because the motion was filed by Schacht, not Allstate. However, it is apparent that Attorney Whipple was acting on Allstate's behalf, not Schacht's, when she filed the motion to dismiss claims against Allstate. Allstate does not suggest, and we cannot conceive of, any way in which the dismissal motion benefited Schacht.

using a rational process, reached a conclusion that a reasonable judge could reach. *See Paige K.B. v. Steven G.B.*, 226 Wis. 2d 210, 233, 594 N.W.2d 370 (1999). Whether the circuit court utilized the proper legal standard is a question of law we review *de novo. See Three & One Co. v. Geilfuss*, 178 Wis. 2d 400, 410, 504 N.W.2d 393 (Ct. App. 1993).

¶ 13. WISCONSIN STAT. § 802.05 provides, in relevant part, that the signature of an attorney or a party on a pleading, motion, or other document constitutes a certification that such paper is well-grounded in fact. If the court determines that an attorney or party failed to make that necessary determination, the court may impose an appropriate sanction on the person who signed the paper or on the represented party or on both.[3]

¶ 14. Pursuant to WIS. STAT. § 814.025(1) and (3)(b), costs and reasonable attorney fees "shall" be

[3] WISCONSIN STAT. § 802.05(1)(a) states, in relevant part:

> The signature of an attorney or party constitutes a certificate that the attorney or party has read the pleading, motion or other paper; that to the best of the attorney's or party's knowledge, information and belief, formed after reasonable inquiry, the pleading, motion or other paper is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that the pleading, motion or other paper is not used for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation .... If the court determines that an attorney or party failed to read or make the determinations required under this subsection before signing any petition, motion or other paper, the court may, upon motion or upon its own initiative, impose an appropriate sanction on the person who signed the pleading, motion or other paper, or on a represented party, or on both. The sanction may include an order to pay to the other party the amount of reasonable expenses incurred by that party because of the filing of the pleading, motion or other paper, including reasonable attorney fees.

awarded to the "successful party" when a defense is "frivolous." A defense is "frivolous" when "[t]he party or the party's attorney knew, or should have known, that the [defense] was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law."[4]

¶ 15. Allstate suggests that WIS. STAT. § 814.025(3)(b) only covers legal arguments, not factual matters, because it refers to defenses and claims made "without any reasonable basis in law or equity [and that cannot] be supported by a good faith argument for an extension, modification or reversal of existing law." However, § 814.025(3)(b) encompasses claims that are frivolous precisely because "knowledge of the relevant facts [that the party knew or should have known] would lead a reasonable party or attorney to conclude that

---

[4] WISCONSIN STAT. § 814.025 states, in relevant part:

(1) If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

. . . .

(3) In order to find an action, special proceeding, counterclaim, defense or cross complaint to be frivolous under sub. (1), the court must find one or more of the following:

. . . .

(b) The party or the party's attorney knew, or should have known, that the action, special proceeding, counterclaim, defense or cross complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

[the claim] is frivolous." *James A.O. v. George C.B.*, 182 Wis. 2d 166, 184, 513 N.W.2d 410 (Ct. App. 1994); *see also Stoll v. Adriansen*, 122 Wis. 2d 503, 515, 362 N.W.2d 182 (Ct. App. 1984) ("[T]he statute assumes and requires an adequate investigation of the facts and law.").[5]

¶ 16. In denying the Paulsons' request for sanctions, the circuit court addressed only the conduct of Allstate's counsel and concluded she did nothing improper. The court observed that employees of Allstate, not counsel, executed the affidavits containing factual inaccuracies. However, as explained above, both WIS. STAT. § 802.05(1)(a) and WIS. STAT. § 814.025(3)(b) are also directed at the conduct of the *party.* Thus, the circuit court erred in its legal analysis by focusing solely on the conduct of Allstate's counsel. Moreover, remand is appropriate because the record strongly suggests sanctions are warranted.

¶ 17. The Paulsons obtained a default judgment against Allstate by expending considerable time and effort first fending off Allstate's motion to dismiss claims against Allstate and, second, defeating Allstate's claim of excusable neglect in support of its motion to enlarge time to answer. Counsel for the Paulsons dem-

---

[5] Allstate has not argued that its motions are not covered by WIS. STAT. § 814.025 and, consequently, we do not resolve the matter. However, because we remand this case, we direct the parties' attention to *Gardner v. Gardner*, 190 Wis. 2d 216, 245, 248–51, 527 N.W.2d 701 (Ct. App. 1994); *Schaefer v. Northern Assurance Co. of America*, 182 Wis. 2d 148, 162–63, 513 N.W.2d 615 (Ct. App. 1994); *Gagnow v. Haase*, 149 Wis. 2d 542, 545–46, 439 N.W.2d 593 (Ct. App. 1989); and *Wengerd v. Rinehart*, 114 Wis. 2d 575, 578–83, 338 N.W.2d 861 (Ct. App. 1983).

onstrated that the original motion to dismiss was groundless and that the subsequent motion to extend time to answer was based on a false assertion regarding service. The needless effort included contacting CT Corporation initially, deposing multiple employees of CT Corporation and Allstate, drafting several pleadings, and presenting arguments during court appearances.

¶ 18. At a minimum, the circuit court should have considered sanctioning Allstate under WIS. STAT. § 802.05(1)(a) because its employee, Jackie Christiansen, submitted an affidavit falsely asserting that Allstate's Brookfield office did not have a record of having received the Paulson summons and complaint. It is undisputed that this was an incorrect statement, and it also appears undisputed that Allstate's own easily accessible records would have revealed the error if only the records had been checked. In the context of its default ruling against Allstate, the circuit court found "[t]here is really no viable explanation as to what specifically occurred that resulted in [the service information] not being forwarded on behalf of Allstate to the defense counsel."

¶ 19. We need not comment further on possible grounds for sanctions. We remand for reconsideration of the imposition of sanctions, consistent with this opinion.

### II. Whether the Circuit Court Properly Excluded Evidence of Property Damages

#### A. Background

¶ 20. Peggy Paulson sought property damages, medical expenses, lost wages, and pain and suffering. Peggy's husband, Douglas, and her daughter, Michelle

905

Wagner, alleged claims for loss of society, companionship, and loss of consortium. The Paulsons' vehicle insurer, Midwest Security Insurance Company, was named as a subrogee. The Paulsons' vehicle was initially repaired at a cost of $7,542.44 and returned to them. Midwest Security paid $7,042.44 for the repairs ($7,542.44 less a $500 deductible paid by the Paulsons).

¶ 21. Thereafter, Midwest Security negotiated with Schacht's insurer, Allstate. The two insurers agreed that Allstate would pay Midwest Security $4,929.71, an amount equal to 70% of the $7,042.44 Midwest Security had paid for repairs. Allstate paid this amount to Midwest Security to settle Midwest Security's potential subrogation claim.

¶ 22. The circuit court dismissed both Schacht and Midwest Security as parties. The court also granted the Paulsons' motion for default judgment against Allstate with respect to liability.

¶ 23. Allstate filed a motion in limine, seeking to prevent the Paulsons from introducing evidence of their property damages. At the hearing on that motion, Allstate argued that the Paulsons should be prohibited from introducing evidence supporting property damages in the amount of $8,105.93 because, Allstate reasoned, the Paulsons' insurer, Midwest Security, previously settled any claim for property damages with Allstate. The court agreed with Allstate's position, holding that the Paulsons had no claim for property damages apart from the $500 deductible.

¶ 24. At trial, the Paulsons presented evidence of Peggy's personal injuries, loss of consortium, costs associated with loss of use of the vehicle during repairs ($540), wage loss by Peggy ($231), and the deductible paid ($500). These damages and awards are not at issue in this case.

¶ 25. Despite the circuit court's pretrial ruling prohibiting evidence of property damages, Allstate did not object when Peggy testified that on October 1, 1998, she returned to the dealership where her vehicle was repaired, complaining that the car was pulling to the right, and received a new steering box at a cost of $559. Peggy also testified that after the accident she had to have new brake rotors installed three times. When the Paulsons attempted to introduce testimony regarding diminution in value, Allstate objected and the court sustained that objection based on its pretrial ruling. However, the court did permit testimony in the form of an offer of proof, and both Peggy and her husband Douglas testified that the car was worth $10,500 prior to the accident, and $2,000 after. The circuit court instructed the Paulsons to make any further offer of proof in writing after the trial.

¶ 26. After trial, the Paulsons submitted affidavits repeating the assertion that the value of the vehicle was $10,500 prior to the collision, and $2,000 after. The Paulson affidavits also averred that the amount for initial repairs was $8,104 and that they subsequently paid $600 to replace the "rotors on the brakes" three times.

## B. Discussion

¶ 27. On appeal, the Paulsons make two distinct arguments. First, they argue that, pursuant to the "collateral source rule," they are entitled to recover from Allstate the amount Midwest Security paid for the repair of the vehicle. In effect, the Paulsons argue they are entitled to receive the $7,042.44 from Allstate, even though Midwest Security paid this repair cost and even though Allstate paid Midwest Security for subrogation rights to this amount.

¶ 28. Second, the Paulsons claim that the $7,542.44 ($7,042.44 paid by Midwest Security plus the $500 deductible) is not the full measure of their property damages and, therefore, the court erred in preventing them from introducing evidence of damages that exceeded this amount.

¶ 29. We address these claims separately below, but first briefly set forth the nature of the collateral source rule and relevant principles of subrogation.

### 1. The Collateral Source Rule and Principles of Subrogation

¶ 30. Under the collateral source rule, a plaintiff's recovery may not be reduced by payments the plaintiff received from a source other than the tortfeasor. *Koffman v. Leichtfuss*, 2001 WI 111, ¶ 29, 246 Wis. 2d 31, 630 N.W.2d 201. The collateral source rule prevents any payments received by the plaintiff from "inuring to the benefit of a defendant-tortfeasor." *Id.* The supreme court stated in *Koffman*:

> The rule is grounded in the long-standing policy decision that should a windfall arise as a consequence of an outside payment, the party to profit from that collateral source is "the person who has been injured, not the one whose wrongful acts caused the injury."

*Id.* (citation omitted). And in *Ellsworth v. Schelbrock*, 2000 WI 63, ¶ 7, 235 Wis. 2d 678, 611 N.W.2d 764, the supreme court explained that a tortfeasor who is legally responsible for a plaintiff's injuries or damages is not relieved of that obligation simply because the plaintiff had the foresight to arrange for benefits from a collateral source.

¶ 31. The interaction of the collateral source rule and subrogation has been a source of confusion. *Koffman*, 2001 WI 111 at ¶ 33. Subrogation is explained in *Koffman* as follows:

> By virtue and to the extent of payments made on behalf of another, a subrogated party obtains a right of recovery in an action against a third-party tortfeasor and is a necessary party in an action against such a tortfeasor. Subrogation exists to ensure that the loss is ultimately placed upon the wrongdoer and to prevent the subrogor from being unjustly enriched through a double recovery, *i.e.*, a recovery from the subrogated party and the liable third party.

*Id.* (citations omitted).

### 2. The Paulsons' Claim for $7,042.44, Already Paid by Midwest Security

¶ 32. The Paulsons claim that, under the collateral source rule, they are entitled to receive from Allstate the full $7,042.44 that Midwest Security paid for car repairs, even though the Paulsons are no longer obligated to pay that amount to the repair shop. Allstate contends that subrogation principles prohibit the Paulsons from receiving any of the $7,042.44 paid by Midwest Security. We reject the positions of both parties and break the dispute over this $7,042.44 amount into two parts: (1) the dispute over $4,929.71 paid by Allstate to Midwest Security to settle Midwest Security's subrogation claim, and (2) the dispute over the remaining $2,112.73.

¶ 33. As to the $4,929.71, we agree with Allstate that denying the Paulsons this amount is consistent with subrogation principles. To the extent Allstate paid

Midwest Security to compensate Midwest for money Midwest paid for repairs to the Paulsons' vehicle, Allstate has already compensated the party with subrogation rights to the $4,929.71 of car repair expenses.

¶ 34. Additionally, a key facet of the collateral source rule is that a plaintiff's recovery cannot be reduced by payments or benefits from a source *other than* the tortfeasor. *Koffman*, 2001 WI 111 at ¶ 29. The corollary to this facet is that a tortfeasor, or the tortfeasor's insurer, should not be required to pay an amount twice. Here, Allstate, as the tortfeasor's insurer, has been held accountable for and paid $4,929.71.

¶ 35. As to the $2,112.73, we do not write on a clean slate. The dispute regarding this amount is akin to the dispute we resolved in *Reed v. Bradley*, 2000 WI App 165, 238 Wis. 2d 439, 616 N.W.2d 916. The pertinent facts in *Reed* are the same as those here, with one exception: *Reed* dealt with medical damages, while here we address property damages. However, as explained below, this difference does not dictate a different result.

¶ 36. The plaintiffs in *Reed* were injured in an automobile accident. The plaintiffs' medical expenses, in the amount of $2,978, were paid by their insurer. *Id.* at ¶ 1. The defendant's insurer negotiated a settlement with the plaintiffs' insurer in which the defendant's insurer paid about 75% of the medical expenses ($2,246) in exchange for assignment of its subrogation claim. *Id.* Following a trial, the plaintiffs were awarded the difference between what plaintiffs' insurer paid for medical expenses and what defendant's insurer paid for

the assignment of subrogation rights ($2,978 - $2,246 = "some $731"). *Id.* at ¶ 2. The defendant's insurer appealed.

¶ 37. As Allstate does here, the defendant's insurer in *Reed* claimed that awarding any portion of the amount already paid by plaintiffs' insurer constituted an improper double payment to the plaintiffs. We disagreed, explaining:

> In our view, [plaintiffs' insurer's] agreement to settle its limited subrogation claim for less than its face value is analogous to the situation where a health care provider sets an injured plaintiff's broken bone for less than the reasonable cost.

*Id.* at ¶ 4. Thus, in *Reed* we likened the situation before us to the situation in which a tortfeasor is required to pay the fair market value of medical expenses, even where the plaintiff acquired the medical services for a lower cost. This approach to tortfeasor liability was subsequently reaffirmed in *Koffman. Koffman*, 2001 WI 111 at ¶ 26. Indeed, we find nothing in *Koffman*, or any other decision, that conflicts with our analysis in *Reed*.

¶ 38. We discern one possible pertinent difference between *Reed* and the facts here. The subject of subrogation in *Reed* was medical expenses, while the subject of subrogation here is property damages. For the reasons that follow, we conclude this is not a difference that should produce a different result.

¶ 39. Generally speaking, the collateral source rule applies to property damages. *See Ellsworth*, 2000 WI 63 at ¶ 7 (quoting with approval the application of the collateral source rule to wages in *Campbell v. Sutliff*, 193 Wis. 370, 374, 214 N.W. 374 (1927), *overruled on other grounds, Powers v. Allstate Ins. Co.*, 10

Wis. 2d 78, 92, 102 N.W.2d 393 (1960)). *See also Town of Fifield v. State Farm Mut. Auto. Ins. Co.*, 114 Wis. 2d 518, 521, 339 N.W.2d 348 (Ct. App. 1983), *rev'd on other grounds,* 119 Wis. 2d 220, 349 N.W.2d 684 (1984). However, the more specific question here is whether a particular application of the collateral source rule applies to property damage claims, that is, the rule that a tortfeasor is liable for the reasonable value of damages, even if the actual charge to the plaintiff was less. It is this latter, more specific application of the rule that *Reed* relies on as analogous.

¶ 40. With respect to medical services, it is now well established in Wisconsin that a plaintiff may recover from a tortfeasor the reasonable value of such services, even if the actual charge to the plaintiff was less. *Koffman*, 2001 WI 111 at ¶¶ 29–32, 47. As the *Koffman* court explained:

> In the context of medical expense damages, the collateral source rule allows the plaintiff to seek recovery of the reasonable value of medical services without consideration of gratuitous medical services rendered or payments made by outside sources on the plaintiff's behalf, including insurance payments.

*Id.* at ¶ 30.

¶ 41. While the *Koffman* court spoke of the valuation of *medical expense* damages as a distinct legal principle, *id.* at ¶¶ 26–28, we find no suggestion in *Koffman* that there is something unique about medical expenses as compared with other damages. That is, we find nothing in *Koffman* suggesting that the requirement that a tortfeasor pay fair market value, regardless of the plaintiff's actual expense, applies only to medical expense damages. To the contrary, the *Koffman* court justified the application of the collateral source rule to

medical expenses using only reasons that would apply equally to property damage claims. For example, the court held that a tortfeasor is liable for the fair market value of medical expenses, regardless of actual cost, to assure "that the liability of similarly situated defendants is not dependent on the relative fortuity of the manner in which each plaintiff's medical expenses are financed." *Id*. at ¶ 31.

¶ 42. Furthermore, the "Cost of Repair" rule is used in the standard jury instruction regarding damage to repairable personal property. WISCONSIN JI—CIVIL 1804 instructs that one measure of damage is the "Cost of Repair" rule under which cost is measured by the "reasonable" cost of repairs, "not what may have been the actual cost."

¶ 43. Finally, we find no basis for drawing a distinction in terms of subrogation law. In *Rimes v. State Farm Mutual Automobile Insurance Co.*, 106 Wis. 2d 263, 272, 316 N.W.2d 348 (1982), a case applying subrogation principles to medical expenses, the court expressly rejected the argument that a distinction should be made between property damage cases and personal injury cases. The *Rimes* court said this is a "distinction without a difference." *Id*.

¶ 44. Therefore, because in *Reed* we applied the rule requiring tortfeasors to pay the fair market value of medical expenses, regardless of assignment of subrogation rights, and because we can detect no relevant distinction between the situation in this case and the situation in *Reed*, we follow *Reed*. Applied here, this means the Paulsons are entitled to at least $2,112.73 in additional damages (the $7,042.44 paid by Midwest Security for repairs reduced by the $4,929.71 Allstate paid Midwest Security).

### 3. *Damages Beyond Those Paid by Midwest Security*

¶ 45. The Paulsons also complain they were erroneously prohibited from introducing evidence of vehicle-related damages in excess of the $7,542.44 initial repair expense ($7,042.44 paid by Midwest Security plus the $500 deductible). Allstate does not dispute the general proposition that plaintiffs may recover from a tortfeasor damages not covered by the plaintiff's insurance company. This concession is appropriate. *See Koffman*, 2001 WI 111 at ¶ 43 (the creation of a subrogation interest does not "extinguish the insured's right to recover [from a tortfeasor] amounts above and beyond those paid by the insurer").

¶ 46. The parties also agree that plaintiffs in an automobile property damage case are entitled to either the reasonable cost of repairs or the diminution in fair market value of the vehicle, whichever is less. This agreement is in keeping with case law and the standard jury instruction. *See Engel v. Dunn County*, 273 Wis. 218, 222, 77 N.W.2d 408 (1956); *Zindell v. Cent. Mut. Ins. Co.*, 222 Wis. 575, 583, 269 N.W. 327 (1936); WIS JI—CIVIL 1804; *but see Nischke v. Farmers & Merchs. Bank & Trust*, 187 Wis. 2d 96, 117–20, 522 N.W.2d 542 (Ct. App. 1994) (general rule inapplicable in property damage case involving environmental cleanup).

¶ 47. Regardless of the reason the circuit court excluded the evidence of additional repair costs during trial, Allstate contends on appeal that the Paulsons are not entitled to remand for the purpose of presenting such evidence because the Paulsons' offer of proof was insufficient. Allstate starts with the proposition that the $7,542.44 repair cost is less than the asserted

diminished value and then argues that the pertinent question is whether the Paulsons' offer of proof contains admissible evidence of repair costs in addition to $7,542.44. Allstate asserts the offer of proof is inadequate because (1) the alleged additional repair costs were "relied upon solely to bolster [the Paulsons'] diminution in value claim," not as evidence of additional costs, and (2) even if the Paulsons did offer to testify about additional repairs, their testimony was inadmissible because they offered "no foundation" showing they were competent to testify that the brake repairs were necessitated by the collision with Schacht's vehicle.

¶ 48. As to Allstate's first argument, we disagree that the offer of proof addressed only diminution in value. As recited in the affidavits, both Peggy and Douglas were prepared to testify that the initial repairs cost $8,104 and that they later paid $600 to replace the "rotors on the brakes" three times. The total of these two amounts, $8,704, exceeds the $7,542.44 initial repair expense.[6]

■

¶ 49. Allstate's remaining argument is that the Paulsons' proffered testimony is inadmissible because the record does not show that the Paulsons are competent to testify that the brake repairs were necessitated by the collision. We agree with Allstate that expert

---

[6] The parties do not address the discrepancy between the $8,104 repair cost asserted by the Paulsons in their affidavits and the $7,542.44 repair amount referred to elsewhere in the briefs and in the record. However, it appears the $8,104 amount was arrived at by adding the steering box expense, $559, which Peggy testified about at trial, to the $7,542.44 figure. Regardless, because the Paulsons' affidavits assert the $8,104 figure, we will assume they are prepared to present evidence supporting or explaining that amount.

testimony is necessary on subjects outside the realm of ordinary experience. *See Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 150, 172 N.W.2d 427 (1969). But we do not agree that an expert is always needed to establish whether automobile repairs are necessitated by a particular collision.

¶ 50. "The requirement of expert testimony is an extraordinary one, and [should be] applied by the trial court only when unusually complex or esoteric issues are before the jury." *White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557 (1989). "In everything pertaining to the ordinary and common knowledge of mankind jurors are supposed to be competent, and peculiarly qualified to determine the connection between the cause and effect established by common experience, and to draw the proper conclusions from the facts before them; and if the matter can be decided from ordinary experience and knowledge, the [jurors] are allowed to decide it unaided . . . ." *Cramer*, 45 Wis. 2d at 153 (citations omitted); *see, e.g., State v. Serebin*, 119 Wis. 2d 837, 861, 350 N.W.2d 65 (1984) (expert witness not required to demonstrate that residents' weight loss was caused by nursing home's reduction in food portions and available staff); *Finken v. Milwaukee County*, 120 Wis. 2d 69, 78, 353 N.W.2d 827 (Ct. App. 1984) (expert witness not required to prove a twelve-year-old boy's emotional distress was caused by beating); *cf. Johnson v. Heintz*, 61 Wis. 2d 585, 590–92, 213 N.W.2d 85 (1973) (expert testimony necessary to demonstrate injuries incurred in a car accident caused a person to fall some four and a half years after the car accident).

¶ 51. Although causation regarding vehicle damage is not always within the realm of ordinary juror

experience, we conclude that expert testimony is not required in this case. Peggy Paulson was driving a seven-month-old Saturn automobile when she was hit by Schacht's vehicle. The crash was described in testimony as "severe," and Peggy's air bag deployed. Douglas Paulson testified that when he viewed their car at the scene, he thought the car was a "total loss." The Paulsons' offer of proof can be read as an assertion that the brake problem was first present when the car was returned after the initial repair. Given the vehicle's age, the crash severity, and the sequence of events, the proffered evidence is sufficient to support a finding that the collision caused the brake problem.

¶ 52. Therefore, when viewed in context, the Paulsons' offer of proof was sufficient. Because Allstate has not suggested any other reason why the Paulsons should be prohibited from presenting such evidence, we remand for a new trial on car repair damages exceeding $7,542.44.

### III. Costs and Fees under WIS. STAT. § 814.04(2)

#### A. Background

¶ 53. There are three plaintiffs in this action: Peggy Paulson, Douglas Paulson, and Peggy's daughter Michelle Wagner. After trial, the Paulsons submitted a "bill of costs and fees" requesting statutory attorney fees, pursuant to WIS. STAT. § 814.04(1)(a). The "bill" also identified additional costs available under § 814.04(2), totaling $1,875.96. The Paulsons requested that these § 814.04(2) disbursements be paid by Allstate four times: once to Peggy, once to Michelle, and twice to Douglas. The Paulsons requested double costs

for Douglas pursuant to Wis. Stat. § 807.01(3), because his underlying award exceeded his settlement offer.[7]

[7] Wisconsin Stat. § 807.01(3) provides:

> After issue is joined but at least 20 days before trial, the plaintiff may serve upon the defendant a written offer of settlement for the sum, or property, or to the effect therein specified, with costs. If the defendant accepts the offer and serves notice thereof in writing, before trial and within 10 days after receipt of the offer, the defendant may file the offer, with proof of service of the notice of acceptance, with the clerk of court. If notice of acceptance is not given, the offer cannot be given as evidence nor mentioned on the trial. If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the amount of the taxable costs.

Wisconsin Stat. § 814.04 provides, in relevant part:

> (1) ATTORNEY FEES. (a) When the amount recovered or the value of the property involved is $1,000 or over, attorney fees shall be $100; when it is less than $1,000 and is $500 or over, $50; when it is less than $500 and is $200 or over, $25; and when it is less than $200, $15.
>
> . . . .
>
> (2) DISBURSEMENTS. All the necessary disbursements and fees allowed by law; the compensation of referees; a reasonable disbursement for the service of process or other papers in an action when the same are served by a person authorized by law other than an officer, but the item may not exceed the authorized sheriff's fee for the same service; amounts actually paid out for certified copies of papers and records in any public office; postage, telegraphing, telephoning and express; depositions including copies; plats and photographs, not exceeding $50 for each item; an expert witness fee not exceeding $100 for each expert who testifies, exclusive of the standard witness fee and mileage which shall also be taxed for each expert; and in actions relating to or affecting the title to lands, the cost of procuring an abstract of title to the lands. Guardian ad litem fees shall not be taxed as a cost or disbursement.

¶ 54. Allstate argued before the circuit court that the Paulsons' § 814.04(2) disbursements should only be taxed twice: once to compensate the Paulsons for their out-of-pocket disbursements and a second time because Douglas was entitled to double costs pursuant to Wis. Stat. § 807.01(3). Deducting one $59.85 item, Allstate agreed that it should pay $1,816.11 once to the Paulsons, and then $1,816.11 again to Douglas to fulfill its obligation under § 807.01(3). Thus, Allstate contended it should pay $3,957.22 in costs, representing $325 in attorney fees and $3,632.22 in § 814.04(2) disbursements.[8]

¶ 55. The circuit court issued a written order concluding that each of the Paulsons were separately entitled to statutory attorney fees, with Douglas receiving double attorney fees.[9] Regarding the Paulsons' § 814.04(2) disbursements, however, the court rejected both the Paulsons' request and the approach suggested by Allstate. The circuit court concluded that each of the Paulsons should be awarded one-third of these disbursements, except that Douglas's one-third should be doubled. In the final judgment, the circuit

---

[8] The $59.85 item was for "Certified copies: medical records." In the circuit court, Allstate relied on *Kleinke v. Farmers Cooperative Supply & Shipping*, 202 Wis. 2d 138, 148, 549 N.W.2d 714 (1996), to assert that this cost is not allowed. The Paulsons responded that it is an allowable cost, citing *Seltrecht v. Bremer*, 214 Wis. 2d 110, 124–25, 571 N.W.2d 686 (Ct. App. 1997). We do not address the question because the circuit court's final order includes this amount and Allstate has not complained.

[9] Allstate does not dispute the amount of attorney fees awarded under Wis. Stat. § 814.04(1)(a): $100 to Peggy, double that amount to Douglas pursuant to Wis. Stat. § 807.01(3), and $25 to Michelle.

court awarded $2,826.28 in total costs, including $325 in undisputed attorney fees. It is readily apparent that the circuit court accepted the full amount of § 814.04(2) disbursements asserted by the Paulsons, $1,875.96, and divided this amount in thirds. Thus, the court awarded $625.32 to Peggy and Michelle and double this amount to Douglas.

## B. Discussion

¶ 56. The Paulsons argue that WIS. STAT. § 814.04(2) authorizes multiple awards for the same disbursement to multiple plaintiffs in the same action. They rely on *Gospodar v. Milwaukee Automobile Insurance Co.*, 249 Wis. 332, 24 N.W.2d 676 (1946), and *Zintek v. Perchik*, 163 Wis. 2d 439, 471, 471 N.W.2d 522 (Ct. App. 1991), *overruled on other grounds, Steinberg v. Jensen*, 194 Wis. 2d 439, 534 N.W.2d 361 (1995), for the proposition that when multiple plaintiffs consolidate their respective causes of action in a single complaint, regardless whether the compulsory joinder statute applies, each plaintiff may recover costs as if he or she had brought suit individually. Thus, the Paulsons assert, the circuit court erred when it failed to award each of them the full amount of the § 814.04(2) disbursements.

¶ 57. Allstate responds that the circuit court correctly rejected the Paulsons' request by relying on *Gospodar*. Allstate points out that the Paulsons were required to bring their claims in a single action because of the compulsory joinder statute, WIS. STAT. § 803.03(2). In Allstate's view, the circuit court properly concluded that the policy reason for permitting multiple attorney fees to multiple plaintiffs who bring a single lawsuit, as set forth in *Gospodar*, does not

920

apply here because, unlike the plaintiffs in *Gospodar*, Douglas and Michelle could *not* have brought separate lawsuits.

¶ 58. The question presented requires that we construe Wis. Stat. § 814.04(2), a task we perform without deference to the circuit court. *See DeMars v. LaPour*, 123 Wis. 2d 366, 370, 366 N.W.2d 891 (1985). We first look to the language of the statute itself and attempt to interpret it based on "the plain meaning of its terms." *State v. Williquette*, 129 Wis. 2d 239, 248, 385 N.W.2d 145 (1986). Only when statutory language is ambiguous may we examine other construction aids, such as legislative history, context, and subject matter. *State v. Waalen*, 130 Wis. 2d 18, 24, 386 N.W.2d 47 (1986). A statute is ambiguous if reasonable persons could disagree as to its meaning. *Williquette*, 129 Wis. 2d at 248. The application of a statute to undisputed facts is a question of law which we review *de novo*. *State v. Wilke*, 152 Wis. 2d 243, 247, 448 N.W.2d 13 (Ct. App. 1989).

¶ 59. The Paulsons do not discuss the language of Wis. Stat. § 814.04(2). In particular, they do not suggest why the language of that statute authorizes multiple awards for the same costs in the same lawsuit and they do not assert that the statute is ambiguous. Our own review discloses no ambiguity. There is nothing in the language of the statute suggesting that it authorizes multiple awards for the same disbursement to multiple plaintiffs in the same action. On its face, § 814.04(2) simply identifies and authorizes a court to award various out-of-pocket costs while placing upper limits on some of these costs.

¶ 60. As noted above, the parties do discuss *Gospodar* and *Zintek*. However, these cases address the

propriety of awarding multiple statutory attorney fees under Wis. Stat. § 814.04(1), they do not address § 814.04(2) disbursements.[10]

¶ 61. The attorney fees subsection, Wis. Stat. § 814.04(1), specifies a set amount for attorney fees, ranging from $15.00 to $100.00, depending on the amount of recovery. These fixed amounts apply regardless whether multiple plaintiffs employ a single attorney, and regardless of actual attorney fees. The statute is not designed to reimburse actual out-of-pocket attorney costs. At the same time, under *Gospodar* and *Zintek*, when there are multiple plaintiffs in a single action, attorney fees are multiplied. *Gospodar*, 249 Wis. at 339–39a; *Zintek*, 163 Wis. 2d at 471–72. This is a sensible interpretation of § 814.04(1) because additional plaintiffs invariably cause some amount of additional attorney work. In any event, attorney fees in subsection (1) are determined solely by the amount in controversy. In contrast, subsection (2) of § 814.04 ties awards to actual out-of-pocket costs, while sometimes

---

[10] While *Gospodar* uses the term "costs," the briefing in that case and subsequent decisions make clear that the item of cost at issue was statutory attorney fees under the predecessor statute to Wis. Stat. § 814.04(1). The applicable statute in *Gospodar* was Wis. Stat. § 271.04 (1943), the predecessor to § 814.04. Under § 271.04(1) and (2), "costs" were defined as "fees" and "disbursements" respectively. Although the legislature changed the word "fees" in § 271.04(1) to "attorney fees" in § 814.04(1), substantively the text of subsection (1) remains the same. Indeed, in both *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 577 N.W.2d 617 (1998), and *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991), the supreme court and this court indicated that *Gospodar* applies to attorney fees. *See Gorton*, 217 Wis. 2d at 513; *Zintek*, 163 Wis. 2d at 471–72.

placing an upper limit on certain costs. Because subsection (2) speaks of actual out-of-pocket expenditures, we see no reason to ignore the plain language of the statute and multiply costs for each additional plaintiff. Thus, the structure of subsections (1) and (2) differ, and we are not bound by prior interpretations of subsection (1).

¶ 62. Accordingly, we hold that when, as here, multiple plaintiffs are required to bring their claims in a single action pursuant to the compulsory joinder statute, WIS. STAT. § 814.04(2) does not authorize multiple awards for the same disbursement to multiple plaintiffs.[11]

### IV. Summary

¶ 63. In summary, we reverse and remand for reconsideration the circuit court's decision denying the Paulsons' request for sanctions under WIS. STAT.

---

[11] This is a compulsory joinder case and our holding is limited to that situation. We express no opinion on the application of WIS. STAT. § 814.04(2) to non-compulsory joinder cases. We also note an issue the parties might have raised, but have not. The parties agree that Douglas should be awarded double his § 814.04(2) disbursements, pursuant to WIS. STAT. § 807.01(3). The question remains—What amount should be doubled? Allstate agreed before the circuit court that all § 814.04(2) disbursements could be doubled. However, the circuit court divided the plaintiffs' § 814.04(2) disbursements in thirds, awarded one-third to each, and then doubled Douglas's one-third. This method resulted in a total out-of-pocket-costs award to the Paulsons of about $1,100 less than agreed to by Allstate. The Paulsons have not attempted to show that the circuit court's approach violates the statutes and the parties have not briefed the issue. We affirm the circuit court's award in this respect, but express no opinion on the propriety of its methodology.

§§ 802.05 and 814.025. We reverse the circuit court's decision that the Paulsons are not entitled to recover from Allstate any part of the $7,042.44 previously paid by Midwest Security. In this respect, we direct the circuit court to award the Paulsons $2,112.73 ($7,042.44 paid by Midwest Security for repairs reduced by $4,929.71 Allstate paid Midwest Security). We also reverse the circuit court's decision prohibiting the Paulsons from presenting evidence of damages exceeding $7,542.44 (the amount paid by Midwest Security plus the deductible paid by the Paulsons) and remand for further proceedings consistent with section II.B.3. of this opinion. We affirm the circuit court in all other respects.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.