DOWNEY, INC., a Wisconsin corporation, Plaintiff-Respondent,

v.

The BRADLEY CENTER CORPORATION, a Wisconsin corporation, Defendant,

HUBER, HUNT & NICHOLS, INC., an Indiana corporation, and United States Fidelity & Guaranty Corporation, a Maryland corporation, Defendants-Appellants.

Court of Appeals

*No. 93–2440. Submitted on briefs August 2, 1994.—Decided October 25, 1994.*

(Also reported in 524 N.W.2d 915.)

For the defendants-appellants the cause was submitted on the briefs of *John W. Hein* and *David J. Edquist* of *Gibbs, Roper, Loots & Williams, S.C.* of Milwaukee and *Alan H. Goldstein* and *Donna J. Bays,*

of *Dutton Overman Goldstein Pinkus, P.C.* of Indianapolis, Indiana.

For the plaintiff-respondent the cause was submitted on the briefs of *Steven G.M. Stein* and *John S. Mrowiec* of *Stein, Ray & Conway* of Chicago, Illinois.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

WEDEMEYER, P.J. Huber, Hunt & Nichols, Inc. (HH&N) and United States Fidelity and Guaranty Corporation (USF&G) appeal from a judgment, after a jury found that HH&N breached its subcontract with Downey, Inc. The jury awarded Downey, Inc., $1.7 million in damages. The issues on appeal are: (1) whether the trial court erred in finding a portion of the contract ambiguous and, as a result, instructing the jury that it could find implied duties from the conduct of the parties; (2) whether the trial court erred in submitting the question on consequential damages for lost profits to the jury; (3) whether the trial court erred in allowing Downey to change its damage theories on the eve of trial; (4) whether paying the judgment to the clerk of court tolls accrual of postjudgment interest; and (5) whether HH&N and USF&G are entitled to a new trial because the trial court erred in allowing a juror who spoke briefly to the president of Downey to remain on the jury. Because we conclude that the trial court did not err on issues (1), (2), (3) and (5) above, we affirm the judgment as to those issues but, because we conclude that full payment into the court tolls the accrual of postjudgment interest, we reverse on issue (4).

## I. BACKGROUND

This case arises out of the construction of the Bradley Center.[1] HH&N was the general contractor and Downey was the mechanical systems subcontractor. USF&G was the bonding company that issued a surety bond for HH&N's contract performance. HH&N entered into a subcontract with Downey in the spring of 1987. The subcontract provided for completion of the work by Downey by September 30, 1988. During the course of construction, design revisions and other factors caused numerous delays. HH&N repeatedly put "holds" on Downey's work. Downey contends HH&N represented that the building would be enclosed by November 1987. The building was not enclosed, causing Downey to perform work outside during the winter. Despite the delays and "holds," Downey was not granted any time extensions. HH&N assured Downey that if it needed additional workers or resources to timely complete the project, HH&N would resolve Downey's damage claims after construction was complete. Downey employed additional workers and resources, completed work out of sequence, and worked extended hours in order to substantially complete the work by September 30, 1988. As a result, HH&N increased the contract price of Downey's subcontract; however, Downey contended it was entitled to additional compensation.

Downey filed suit against HH&N and USF&G, claiming: HH&N breached the subcontract by placing holds on portions of Downey's work; by materially changing the timing, sequencing, conditions and duration of Downey's work; by failing to grant Downey an

---

[1] The Bradley Center is a sports arena that also houses a variety of entertainment events.

extension of time to perform; by failing to adjust Downey's compensation; and by failing to pay for Downey's work in a timely manner. The case was tried to a jury, which rendered a verdict in favor of Downey. The jury awarded damages as follows:

| | |
|---|---|
| Direct Contract Damages: | $780,409.00 |
| Losses on Other Projects: | $816,391.00 |
| Interest: | $203,002.00. |

After post-verdict motions, the trial court reduced the interest portion of the damages to $11,785 and otherwise affirmed the verdict. Judgment was entered accordingly. HH&N and USF&G paid $1,709,553.20, which represented the entire verdict plus interest, to the clerk of courts and initiated this appeal.

## II. DISCUSSION

Issues (1) and (2) are governed by Indiana law because of a choice of law provision in the contract. We will, however, apply Wisconsin law for procedural issues, including the standard of review.

### A. Contractual Ambiguity and the Jury Instruction.

HH&N contends that the trial court found the subcontract ambiguous with respect to whether the Bradley Center would be enclosed by the 1987-88 winter. HH&N contends that as a result of the ambiguity, the trial court gave erroneous instructions regarding implied contractual obligations ascertainable from the conduct of the parties. Downey claims it never argued that the contract was ambiguous, and that Indiana law allows giving these jury instructions (without a finding of ambiguity) to enable the jury to consider subsequent

conduct of the parties in determining the meaning of express terms in the contract. The record does not indicate that the trial court made a determination of ambiguity; instead, the trial court based its decision to give the instructions on Indiana case law.

■

The standard of review regarding jury instructions is whether the trial court erroneously exercised its discretion in giving the instruction. *See White v. Leeder*, 149 Wis. 2d 948, 954, 440 N.W.2d 557, 559 (1989). The instructions that HH&N claims were erroneous read as follows:

> Downey contends that Huber-Hunt breached the contract between Downey and Huber-Hunt. A breach of contract means the failure of a party to a contract to perform any promise which forms the whole or a part of the contract. A breach may occur with regard to either an express or an implied provision of the contract. An express provision is one which is specifically agreed to by the parties either knowingly or in writing. An implied provision is one that is recognized by the parties or the law to exist and bind the parties in their actions despite the fact that the provision was not specifically spelled out or agreed to by the parties to the contract. An implied provision often arises out of other terms of the contract which were expressly set forth in the contract and agreed to by the parties. An implied promise constitutes a valid part of the contract.
>
> . . . .
>
> Whether the parties to a contract gave it a particular construction is to be regarded by you in giving effect to the provisions of the contract. The subsequent acts of the parties, showing the construction that they themselves have put upon the agreement,

are to be considered by you for the purpose of assisting you in arriving at a determination of what the arrangement was between the parties.

HH&N contends these instructions should not have been given because they allow the jury to find that subsequent conduct by the parties created additional duties which did not exist in the written subcontract. The trial court rejected this argument, concluding that *Lesh v. Trustees of Purdue University*, 116 N.E.2d 117 (Ind. App. 1953), and *Clark Mutual Life Insurance Co. v. Lewis*, 217 N.E.2d 853 (Ind. App. 1966), specifically allow these instructions to be given.

In *Lesh*, the contractor claimed that when he demanded an increase in the original contract price, because of increased labor demands, he was assured that adjustments would be made. *Id.* at 119-20. The contractor claimed that he relied on this "supplemental agreement" to his detriment and sued Purdue for breach of contract. *Id.* The trial court found that no such promise was made. The Indiana Appellate Court affirmed, stating: "It is an implied condition of every contract that neither party will hinder the other in his discharge of the obligations imposed upon him *nor increase his cost of performance.*" *Id.* at 120 (emphasis added). In the present case, however, it is undisputed that the repeated delays and "holds" led to a subsequent promise that additional compensation would be paid. In fact, additional compensation was paid and the remaining dispute was about the *sufficiency* of the additional compensation.
█

In *Clark*, the Appellate Court of Indiana held "[t]he best criterion of the meaning of a contract is the construction which the parties themselves place on it, and ordinarily their interpretation is looked to by the

court in determining the meaning of the contract." *Id.* at 857. The court found that examining the conduct of the parties was not parol evidence, but a way of determining the meaning of the express terms. *Id.* at 856-57. Because Indiana substantive law provides a sound basis for giving the challenged jury instructions, we conclude that the trial court did not erroneously exercise its discretion.

## B. Consequential Damages.

HH&N claims three errors in relation to consequential damages. First, it claims that Downey failed to comply with notice provisions which precluded a claim for consequential damages as a matter of law. Second, it claims the trial court erred in failing to give a "conditions precedent" instruction with respect to the notice provisions of the contract; and third, it claims the consequential damages are too remote, as a matter of law, to be a natural and probable consequence of HH&N's breach. We address each claim *seriatim.*

First, we agree with HH&N that if Downey failed to comply with the notice provisions of the contract, it would preclude a claim for consequential damages as a matter of law; however, the determination of whether Downey complied with the notice provisions of the contract is a question of fact for the jury, which we cannot overturn unless it is against the great weight and clear preponderance of the evidence. *See Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249, 274 N.W.2d 647, 650 (1979). There was evidence in the record that on twenty-one occasions, Downey made oral and written complaints to HH&N that Downey was suffering damages as a result of the holds, delays, and disruptions. The notice provisions require claims arising from

delay to be made within a reasonable time. Downey's numerous complaints provided ample support for the jury's conclusion. Consequently, a finding that the notice provisions of the subcontract were satisfied was not against the great weight and clear preponderance of the evidence.

■

Second, HH&N claims the trial court erred in refusing to give a "conditions precedent" instruction regarding the notice provisions. In determining whether the trial court erred in refusing to give the conditions precedent instruction, we have a limited scope of review because "the trial court has wide discretion in instructing a jury, and if its instructions adequately cover the law, there is no erroneous exercise of discretion when the court refuses to give a requested instruction, even if the proposed instruction is correct." *Nelson v. Taff*, 175 Wis. 2d 178, 186, 499 N.W.2d 685, 688 (Ct. App. 1993). The trial court in this case found that the substance of the "conditions precedent" instruction could be inferred from the general breach of contract instruction.

The proposed "conditions precedent" instruction would have required that the jury find that Downey complied with all of the conditions under the contract before it could recover. The general breach of contract instruction required the jury to find that Downey fulfilled all of its "promises" under the contract. The trial court found the "conditions precedent" instruction was duplicative of the general breach of contract instruction and therefore was unnecessary. Because the trial court had a sound basis to conclude that the instruction was repetitious of the general instructions, we conclude the trial court did not erroneously exercise its discretion in declining to give it.

Finally, HH&N asks this court to rule, as a matter of law, that the consequential "lost profit" damages were too remote to be a natural and probable result of the breach. HH&N also argues that losses from other projects can only be recovered if the other projects are contingent on or collateral to the subcontract.

Indiana case law specifically provides that a party injured by a breach of a construction contract may recover consequential damages. *Clark's Pork Farms v. Sand Livestock Sys., Inc.*, 563 N.E.2d 1292, 1298 (Ind. Ct. App. 1990). Profits from contracts other than the contract breached will not be regarded as too remote or too speculative " 'if the defendant had reason to foresee them.' " *Insul-Mark Midwest, Inc. v. Modern Materials, Inc.*, 594 N.E.2d 459, 467 (Ind. Ct. App. 1992) (citation omitted). HH&N argues that even if lost profit damages are reasonably foreseeable, they are not recoverable unless the profits are from projects that are *contingent on or collateral to* the Bradley Center project; however, HH&N fails to cite any controlling legal authority in support of its proposition. Therefore, our review is limited to whether HH&N "had reason to foresee" the consequential "lost profit" damages.

The record indicates that HH&N caused numerous delays, placed numerous "holds" on Downey's work, refused to grant extensions and demanded timely performance. The record also indicates that Downey repeatedly complained about the delays, revisions, and holds and was assured that if it committed additional resources to the Bradley Center project, it would be compensated. Testimony was elicited at trial that because of the numerous "holds" and delays, Downey requested time extensions so it would not have to pull resources and workers off other independent projects. The time extensions, however, were denied because

substantial completion by September 30, 1988, was of "paramount importance." Extensions could not be granted because the Milwaukee Bucks, the Milwaukee Admirals and the Marquette Warriors were scheduled to begin their seasons. Season tickets were sold based on Bradley Center seating. A hockey game was scheduled for October 1, 1988. As a result of the critical opening date, Downey was told to "do whatever it had to do" to get the job completed by September 30, 1988. Downey pulled workers and resources off other independent contracts to comply with the completion date. HH&N was informed that the only way to meet the completion date was to pull resources off other independent projects. There was no objection from HH&N. Downey informed HH&N that it would send an additional bill for the "impact" the Bradley Center performance had on its other contracts. There was no objection from HH&N at that time.

The numerous delays, holds and lack of flexibility with the deadline were reasonably foreseeable, particularly for HH&N, an experienced contractor. The repeated complaints by Downey specifically stated the impact that HH&N's actions were having on its resources and other independent projects. As a result, HH&N had ample reason to foresee a claim for lost profits on other jobs. Given these factors, we cannot say, as a matter of law, that consequential damages in the form of lost profits from projects Downey was performing contemporaneously to the Bradley Center were too remote to be unforeseeable.

## C. Modification of Damages Theory.

HH&N claims the trial court erroneously exercised its discretion when it allowed Downey to modify its theory of damages on the eve of trial, in violation of a

pretrial order. In December 1991, the trial court issued an order which prohibited Downey from "revis[ing] its theories of liability, expert reports, five volume claim book or damage calculations at trial." HH&N claims Downey's modifications were in direct violation of this order. Downey claims it did not really change its damage theory, but modified it to address the criticisms by HH&N's expert witnesses, who were not deposed until January 1993.

■

We will not overturn a discretionary determination by the trial court if it is "the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981). The trial court excluded one portion of Downey's damage modification because it clearly violated the January 1993 order. The trial court allowed the remainder of Downey's damage claim to be presented to the jury, but imposed special restrictions on Downey's witnesses. The trial court required Downey's witnesses to refer to the earlier damage theory and explain how the modifications were consistent with the earlier figures. In other words, the trial court allowed Downey to prove that it had not *changed* its damage theory, but simply *modified* it in response to HH&N's experts' criticisms. In reviewing the record and the briefs, this compromise was not an erroneous exercise of discretion.

Further, the trial court found that the last minute "modification" did not affect HH&N's ability to defend the damage claim. In its post-verdict decision, the trial court found that:

> [T]he defense attacked the plaintiff's damages theories (both direct contract and loss on other projects) in exhaustive detail, refuting them on several key points. Their presentation was not that of parties who were unable to mount a defense. Their witnesses went through the plaintiff's exhibits admitted for the purpose of illustrating the damages suffered in a fashion that showed both an understanding of and an ability to rebut them. . . . [T]he defendant's witnesses . . . showed little, if any, confusion about the basis for the plaintiff's claims.

Consequently, the trial court found that these late modifications did not prejudice HH&N's ability to defend the claim.

In sum, the trial court made a rational decision in light of the facts and the law. It did not erroneously exercise its discretion in allowing the damage modifications.

### D. Tolling Postjudgment Interest.

This issue is governed by Wisconsin law. HH&N contends that when it paid the total amount of judgment to the court, it had *paid* the judgment, therefore tolling any additional interest which accrues pursuant to § 815.05(8), STATS. Downey contends post-judgment interest continues to accrue until the total amount of judgment has been paid *to Downey*. The trial court ruled that interest would continue to accrue even though HH&N paid the total amount in the form of a cash bond to the court.

The interpretation of a statute is a question of law which we review without deference to the trial court. *DOR v. Milwaukee Brewers Baseball Club*, 111 Wis. 2d

571, 577, 331 N.W.2d 383, 386 (1983). Section 815.05(8), STATS., states: "[E]very execution upon a judgment for the recovery of money shall direct the collection of interest at the rate of 12% per year on the amount recovered from the date of the entry thereof *until paid*." (Emphasis added.)

Section 815.05(8), STATS., indicates that post-judgment interest will accrue until the judgment is paid. HH&N has paid the judgment. Downey argues that interest should continue to accrue so long as Downey has not received the use of the money. We disagree. The statute does not state that interest will continue to accrue until the judgment *is paid to the prevailing party*, but simply indicates accrual ceases at the time the judgment is paid.

Once the money has been paid into the court, the payor has surrendered the funds and no longer has the use of the money. One purpose of the post-judgment interest statute to motivate the debtor to pay has been satisfied. *See Zintek v. Perchik*, 163 Wis. 2d 439, 479, 471 N.W.2d 522, 538 (Ct. App. 1991). HH&N paid the judgment, which tolled the interest. Therefore, we reverse the trial court and remand with instructions to the trial court to issue an order declaring that the interest ceased to accrue as of the date of payment.

## E. Failure to Remove Juror.

HH&N claims it is entitled to a new trial because the trial court erred in failing to remove a juror for cause prior to the conclusion of the trial. On one of the last days of the trial, while the trial judge and counsel were in chambers, one of the jurors asked the president of Downey how a friend, who had just left the United States Navy, would be able to get a job as a steamfitter.

The president responded that the friend should go to the union hall and he would have no problem getting a job. At this point, the court reporter told both individuals that they should not be talking. The conversation lasted thirty seconds to one minute. The trial court took testimony from several individuals who witnessed the conversation. The trial court also brought the juror into chambers in the presence of counsel to question him. The juror indicated that the conversation would not impact on his objectivity as a juror deciding this case. Consequently, the trial court allowed the juror to remain on the jury.

Although this case involves the request to remove a juror for cause *during* the trial as opposed to during voir dire and *prior* to trial, the standard for review is the same. *See Paper Machinery Corp. v. Nelson Foundry Co., Inc.*, 108 Wis. 2d 614, 628-29, 323 N.W.2d 160, 167 (Ct. App. 1982) (where juror discovered on fourth day of trial that she knew one of the testifying witnesses, she was allowed to remain on the jury because the association would not affect her impartiality). Whether a juror should have been removed for cause is left to the discretion of the trial court and the decision will not be overturned unless the trial court erroneously exercised its discretion. *Id.*

In determining whether the trial court properly exercised its discretion, it is necessary to review whether the trial court examined the relevant facts, applied the proper standard of law, and demonstrated a rational process to reach a reasonable conclusion. *Hartung*, 102 Wis. 2d at 66, 306 N.W.2d at 20. We conclude that the relevant facts are that a juror spoke for a brief period of time with one of the parties, and that the conversation was not about the substance of

450

the case, but was a suggestion to the juror on an unrelated issue. The proper legal standard is whether the conversation will affect the juror's impartiality. *Paper Machinery Corp.*, 108 Wis. 2d at 629, 323 N.W.2d at 167.

In the present case, the trial court examined the relevant facts, brought witnesses in for a hearing and examined the juror involved. After conducting this investigation, the trial court found the conversation would not affect the juror's ability to render a fair and impartial verdict. Given the brevity of the conversation, the limited substance of the conversation, and the fact that the president did not offer to personally assist the juror's friend in securing a job, we conclude that allowing the juror to remain on this jury was not an erroneous exercise of discretion.[2]

---

[2] HH&N also claims that the conversation constituted juror misconduct; however, HH&N does not assert any new evidence to support a claim of juror misconduct. Because of the timing of this incident, we conclude HH&N's claim is more accurately one of juror impartiality rather than juror misconduct. The conversation *occurred and was discovered* prior to the close of the case. The timing allowed the trial court to conduct a hearing into any potential partiality the conversation may have caused. The trial court determined that the conversation did not affect the juror's partiality. As noted, the trial court's decision was not an erroneous exercise of discretion. HH&N failed to produce any evidence that misconduct occurred subsequent to the trial court's determination. Absent any information discovered after the trial court's determination that would alter the ruling that this juror could render a fair and impartial verdict, HH&N cannot assert a valid juror misconduct claim.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded with instructions.