ESTATE OF James H. MATTESON,
Plaintiff-Respondent-Cross-Appellant,

v.

Robert R. MATTESON, Nancy L. Matteson,
and Matteson Communications,
Defendants-Appellants-Cross-Respondents.†

Court of Appeals

*No. 2005AP2607. Oral argument November 6, 2006.
—Decided January 10, 2007.*

## 2007 WI App 23

(Also reported in 729 N.W.2d 749.)

† Petition to review filed.

On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of and oral argument by *Stephen L. Morgan* and *Jennifer M. Krueger* of *Murphy Desmond, S.C.* of Madison.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Charles J. Hertel* and *Daniel J. Posanski* of *Dempsey, Williamson, Young, Kelly & Hertel, LLP* of Oshkosh. There was oral argument by Charles J. Hertel.

A nonparty brief of a Committee of Unincorporated Business Organizations, Business Law Section, State Bar of Wisconsin was filed by *Thomas J. Nichols*, Chairman, of *Meissner Tierney Fisher & Nichols, S.C.* of Milwaukee, *Joseph W. Boucher* of *Neider & Boucher, S.C.* of Madison, *Michael J. Klinker* of *Whyte Hirschboeck Dudek, S.C.* of Milwaukee, *Joseph D. Masterson* of

*Quarles & Brady LLP* of Milwaukee, *James N. Phillips* of *Godfrey & Kahn, S.C.* of Milwaukee, *Walter J. Skipper* of counsel of *Quarles & Brady, LLP* of Milwaukee.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. BROWN, J.   In *Lange v. Bartlett*, 121 Wis. 2d 599, 602, 360 N.W.2d 702 (Ct. App. 1984), we explained that when one partner leaves a partnership and allows the other to continue the business, the departing partner is entitled to receive, in addition to a share of the value of the business, a share of the profits until the business is wound up. We also held that the continuing partner is entitled to be compensated for work done during this time. *Id.* at 606. This case requires us to address in more detail the calculation of the outgoing partner's profit share and the continuing partner's labor compensation.

¶ 2.   The partners here were Robert R. and James M. Matteson, two half-brothers, and the partnership was Matteson Communications, a radio sales and service business. In 2001, James left the partnership, causing its dissolution, and Robert continued the business as an LLC, but the two were unable to agree as to what Robert should pay James for his share of the company. James died shortly after his retirement, and his estate sued. After three and one-half years of litigation and three days of trial, the circuit court awarded James' estate a share of the value of the business at the date of dissolution and a share of the profits earned between the date of dissolution and the date of trial. Both parties appealed, each alleging a multitude of errors in the court's calculation.

¶ 3.   We commend the circuit court for its pains-taking dissection of financial reports and expert testi-mony, and we affirm on most of the claimed errors, including the splitting of the profits according to the partners' predissolution shares. However, we reverse the trial court's decision to compensate Robert only for his work to wind up the partnership; he is entitled, as we said in *Lange,* to compensation for his "substantial labor and management services" to the business. *Id.* We also reverse the court's decision to make the Estate pay for all of Robert's compensation; that cost should be deducted from the profits of the partnership, just as any other cost would be.

¶ 4.   Before presenting the facts more fully, we will give a quick summary of the present state of the law. Because the Mattesons had no written agreement to the contrary, their partnership's end is controlled by Wis. Stat. ch. 178 (2003–04), the Uniform Partnership Act.[1] We have had two previous occasions to discuss the UPA's treatment of continuation after dissolution in published cases:   *First National Bank of Kenosha v. Schaefer,* 91 Wis. 2d 360, 283 N.W.2d 410 (Ct. App. 1979); and *Lange.*

¶ 5.   When a partner decides to cease involvement with a partnership, that partnership is dissolved. Wis. Stat. § 178.26(1)(b). Despite the usual meaning of the word, dissolution does not end the partnership; rather, the partnership continues to exist until its affairs are concluded. Wis. Stat. § 178.25(2). In *Schaefer,* we dis-cussed three possible outcomes when a partner decides

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

to leave a partnership, causing its dissolution. First, the former partners may agree on a settlement for the outgoing partner's share of the business. *Schaefer*, 91 Wis. 2d at 375. Second, if no agreement can be reached, the outgoing partner has the right to sue for windup, forcing the remaining partner to liquidate the partnership's assets and pay off any creditors. *Id.* at 375–76. Whatever money remains is then divided between the partners according to their shares in the partnership; the net effect is that all partners share in any profits or losses between dissolution and the final accounting. *Id.* at 375, 382.

¶ 6. The third possibility is that the outgoing partner allows the other partner to continue the business, but the partners cannot agree on a payout for the outgoing partner. The outgoing partner still has the right to sue for windup, but the ultimate settlement of accounts is different than if the business had been terminated. *Id.* at 382. An outgoing partner in this case is entitled to his or her share of the value of the business at the date of dissolution, plus, at the outgoing partner's election, either interest on that amount or a share of the business' profits from the date of dissolution until the final settlement of accounts. *Id.*; Wis. Stat. § 178.37.

¶ 7. The purpose of awarding the outgoing partner profits or interest is twofold: first, it compensates the outgoing partner for the business's use of his or her assets between dissolution and pay out. *See* 2 Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Partnership § 7.13(f) (Release No. 21–2006–02 Supp. 2006), at 7:209. Second, it serves as a "species of compulsion," giving the continuing partner an incentive for a quick windup. *See id.*; *Lange*, 121 Wis. 2d at 603

(citation omitted). Without such a rule, the continuing partner would have a strong incentive to keep using the outgoing partner's rightful property for as long as possible by dragging out the windup process; besides being unfair, this would be a waste of judicial resources.

¶ 8.   However, we recognized in *Lange* that the continuing partner may be unfairly treated by too broad an application of this rule. In that case, we held that the trial court had not properly determined whether a continuation or a windup had occurred, and we remanded so that it could make this factual determination. *Lange*, 121 Wis. 2d at 604–05. We stated that if the business was, in fact, continued, the departing partner could elect to receive a share of the profits. *Id.* at 605. The continuing partner contended that the departing partner should not reap the benefits of the business' growth since dissolution, but we disagreed, citing the language of Wis. Stat. § 178.37. *Lange*, 121 Wis. 2d at 605–06. However, we continued:

> [W]e understand [the continuing partner]'s concerns, and they can be addressed by compensating [him] for his efforts. Although authorities are not in accord regarding the problem of compensation to continuing partners in the absence of a specific agreement, we feel the better reasoned view is that one who continues a partnership business after dissolution and contributes substantial labor and management services is entitled to compensation for that effort.

*Id.* at 606 (citations omitted).

¶ 9.   The reason for this rule, described in cases cited in *Lange*, is that the departing partner is entitled to profits *attributable to the use of his or her right in the property* of the dissolved partnership. Failing to award compensation to the continuing partner for labor and management services would result, in effect, in giving

the departing partner profits that are *not* attributable to the use of his or her property in the continuing partnership, but are instead attributable to the labor of the continuing partner. *See, e.g., Timmermann v. Timmermann*, 538 P.2d 1254, 1262 (Or. 1975). Thus, just as the profits/interest entitlement prevents the continuing partner from getting free use of the outgoing partner's property, the compensation we described in *Lange* prevents the outgoing partner from squeezing free labor out of the continuing partner. With these rules and principles in mind, we turn to the facts before us.

¶ 10. In the years preceding James' exit from the business, Matteson Communications operated as a general partnership with James receiving 55% of annual profits and Robert receiving 45%. On May 31, 2001, James stopped working and sent Robert a letter stating that as of that date, the partnership was dissolved. Robert formed an LLC, also called Matteson Communications, and continued to run the business.

¶ 11. James died in December 2001. His estate brought suit against Robert and the LLC that same month. The circuit court held numerous proceedings over the next four years, and the parties wrangled repeatedly over discovery. The court found in August 2004 that the partnership had been dissolved on May 31, 2001. It found that on the date of dissolution, James' 55% share of the business was worth $68,641, and that Robert had continued the business. In April 2005, the court determined that the profits from dissolution to the trial date were $282,886.80, and that the Estate was entitled to 55% of that amount, or $155,587. However, the court deducted $91,230 from the Estate's share of the profits to compensate Robert for the time that he and his wife and son had put into concluding the affairs of the partnership, along with various other expenses.

Both parties appealed multiple aspects of the judgment, but they focus mainly on two issues: how to divide the profits when a partnership dissolves and one partner continues the business; and what compensation is allowed to a partner who continues to run the business after dissolution.

■

¶ 12. Robert claims that the circuit court erred by failing to allow him payment for the four years that he ran the business between dissolution and trial, contrary to *Lange*. Instead, the court awarded him compensation only for his labor and expenses directed to winding up the business. The circuit court's rationale for so limiting Robert's compensation was its reading of WIS. STAT. § 178.15(6), which states, "No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his or her services in winding up the partnership affairs." The court also referred to *Lange*, and appeared to equate the compensation that we discussed in that case with the compensation allowed under § 178.15(6). We agree with Robert that this was in error. Nowhere in *Lange* did we mention or discuss § 178.15(6). In fact, we do not believe that § 178.15(6) has any applicability to this case at all. As we stated in *Gull v. Van Epps*, 185 Wis. 2d 609, 625, 517 N.W.2d 531 (Ct. App. 1994) (emphasis added), § 178.15(6) "allows extra compensation only when the partnership is dissolved *due to* the death of a partner and there is a surviving partner." In this case, it was James' decision to retire that dissolved the partnership, not his death six months later.

■

¶ 13. Thus it is *Lange* that controls this case. And there is no suggestion in *Lange* that compensation for

the continuing partner should be limited to efforts directed toward concluding the partnership. Rather, the continuing partner is entitled to compensation for "substantial labor and management services" that he contributes to the operation of the business. *Lange*, 121 Wis. 2d at 606.

¶ 14. Because it is clear from the record that the trial court applied WIS. STAT. § 178.15(6) when it should have applied *Lange,* we reverse this aspect of the decision.[2] Robert is entitled to reasonable compensation for his efforts in running the business after James' departure. This may *include* compensation for his efforts to conclude the affairs of the partnership, but is not limited to it. On remand, the trial court may take additional evidence on this point, or may rely on the already voluminous record.[3] We stress that the trial court, sitting in equity, has wide discretion to craft a fair resolution of this case. *See Gull*, 185 Wis. 2d at 626–27. We remand only because its decision on this issue was

---

[2] The Estate notes that the court's final judgment describes the $91,230 as payment for "concluding the affairs of Matteson Communications and in services in continuing to manage the business of the partnership." However, it is apparent from the hearing transcripts that the circuit court allowed Robert compensation only for concluding the partnership's affairs. The court stated: "I don't find that a labor allowance is allowed . . . . What [Robert] is allowed is . . . his expenditure of hours and value for winding up the partnership affairs."

[3] It may also wish to consider the valuation methods suggested by the amicus curiae in this case, the Committee on Unincorporated Business Organizations of the Business law section of the State Bar of Wisconsin. The Committee submitted a brief at our request, and we wish to express our gratitude, particularly to Thomas J. Nichols, Joseph W. Boucher, Michael J. Klinker, Joseph D. Masterson, James N. Phillips, and Walter J. Skipper.

based upon an incorrect reading of the law. If the circuit court finds that Robert has unduly "run up the tab" for his efforts, as the Estate claims, it may adjust his compensation accordingly.

¶ 15.   However, whatever figure the circuit court ultimately reaches must be deducted from the profits of the partnership before those profits are divided; that is, the bill for Robert's services should be allocated between Robert and the Estate on a 45%/55% basis. As the Estate notes, this is not what the court did with Robert's compensation in the judgment here appealed. Instead, it first divided the profits and then deducted the entire amount from the Estate's share, effectively making the Estate pay for all of Robert's labor. The circuit court cited *Lange* in support of this allocation and stated that "[Robert] did the work, he gets the benefit."

¶ 16.   We do not read *Lange* to compel this result. *Lange* only instructs a circuit court to "deduct [compensation for substantial labor and management services] *before* arriving at the figure of what profit is due the former partner;" it does not say that it should be deducted *from* the profit of the former partner. *Lange*, 121 Wis. 2d at 606 (emphasis added). Further, while it is true that Robert did the work and that he should get the benefit, the issue is not *who* should get the benefit, but rather, *from whom* he should get it.

¶ 17.   As Robert notes in arguing that he should be compensated for his substantial efforts in running the business, it can be useful to ask what the result would be if a third party had instead performed the work. As Robert states, the answer is clearly that the cost of the labor would be deducted from the profits of the partnership, because it is an expense. The fact that it was Robert rather than a third party that did the work

means that Robert should receive the compensation for the work, not that he should cease to be liable for his share of the expense.

¶ 18.   This hypothetical third party also demonstrates the fallacy of Robert's claim that dividing the cost of his labor between him and the Estate results in Robert receiving less than 100% compensation for his efforts. It is true that the method Robert advocates resulted in his share of the company's profits being $91,230 greater than it would have been if the court had split the profits without any labor compensation, while splitting Robert's compensation between Robert and the Estate results in Robert receiving only about $50,000 (55% of $91,230) more than he would if the court had awarded no compensation. However, a simple 55%/45% split without any compensation for Robert's efforts is not the correct baseline from which to measure. Assuming that the labor truly needed to be done (as Robert has maintained throughout the proceedings), someone would have had to do it. If it had been a third party, the total profits of the partnership would have been reduced by the labor costs, and Robert's 45% share of profits would be diminished accordingly. Because Robert did perform the labor, he both receives 55% of the value of that labor and need not pay out 45% of its value, resulting in 100% compensation. Under the method that Robert advocates (and the trial court used), Robert both receives 100% of the value of the labor and need not pay out the 45%, resulting in Robert getting 145% of the value of his labor. We therefore direct the circuit court to divide the cost of Robert's new labor allowance on a 45%/55% basis. For much the same reasons, the same division is appropriate for the record-

storage costs, which the circuit court evidently considered to be part of Robert's "windup" costs.

¶ 19. We now turn to the remaining claims of error, all of which we reject. First, Robert argues that, labor allowance aside, the court again erred when it took the total profit figure and simply divided it 55%/45%; that is, divided the profits as they were divided before the partnership was dissolved. This is not, according to Robert, what WIS. STAT. § 178.37 directs a court to do; rather, it must determine what portion of the profits was *created by the business' use of James' capital.* In addition to the language of the statute, Robert relies on cases interpreting other states' Uniform Partnership Acts, which confirm his interpretation and also require the retiring partner to carry the burden of proof as to how profits were created. *See, e.g., Bader v. Cox,* 701 S.W.2d 677, 684 (Tex. App. 1985).

¶ 20. We agree in a general sense that the task set out in WIS. STAT. § 178.37 is more complicated than simply dividing profits according to the pre-dissolution arrangement. The statute directs the court to determine "the profits attributable to the use of the retired or deceased partner's right in the property of the dissolved partnership"; and as we noted in *Lange,* this figure depends upon the continuing partner's use of partnership assets. *Lange,* 121 Wis. 2d at 606. However, we wholeheartedly disagree with the burden allocation Robert advocates. Though other jurisdictions have decided differently, it is clear to us that the continuing partner, who runs the business and has access to all of its records, is the one who should have to show how profits are earned and to what they are attributable.

¶ 21. Robert did present the trial court with a calculation purporting to show what profits were attributable to the use of James' assets. However, the trial

court rejected it, and with good reason. For one thing, it made no allowance for the value of the goodwill that Matteson Communications had earned in its half-century of existence. For another, the calculation made a number of highly questionable assumptions resulting in the puzzling conclusion that the use of James' assets actually resulted in *losses* for the business. We are mystified as to how that could conceivably be true when James' assets were treated as cash and the business was generally profitable.

¶ 22.   We therefore hold that the trial court was correct in rejecting Robert's calculation of profits attributable to James' assets. Because Robert failed to put forth convincing evidence on this point, it was reasonable for the court to presume that after accounting for Robert's labor, James' 55% of Matteson Communications' assets generated 55% of its profits.[4]

¶ 23.   Robert also claims that the circuit court erred in failing to account for the fact that James allegedly took a portion of their business with him when he left and also that it failed to account for certain losses incurred by the partnership after dissolution. The Estate, for its part, claims that the trial court

---

[4] This is really the flip side of the *Lange* compensation rule. *Lange v. Bartlett*, 121 Wis. 2d 599, 360 N.W.2d 702 (Ct. App. 1984). We award compensation for a continuing partner's labor to avoid giving the departing partner profits attributable to that labor; once the labor has been accounted for, what remains should be the profits attributable to assets. *See* 2 ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 7.13(f) (Release No. 21–2006–02 Supp. 2006), at 7:213–14 (criticizing *Lange* compensation rule on the grounds that proper attribution of profits automatically takes labor into account).

erroneously excluded money spent on attorney fees, accountant fees, and health and retirement benefits from its calculation of the partnership's profits. Though we have tried, the record we have been provided simply does not allow us to reliably reconstruct the facts related to these claims. We therefore have no basis for disturbing the circuit court's decisions on these issues, and we affirm. [5]

---

[5] Robert raises two more related, and to us very minor, issues that we must address. He claims that the circuit court ignored the testimony of its expert about various aspects of the profit division, including his labor compensation, business losses, and James taking a part of the business with him when he left. He claims that there was no evidence other than the expert testimony on these issues, and the court was therefore required to do as the expert suggested. As is usually the case when a party makes this claim, Robert misconceives the law. The court is free to disregard expert testimony that it does not find credible. This is especially true where the expert's testimony is closely intertwined with the legal implications of facts, as was the case here. And the claim that there was no other evidence about Robert's labor and what he should earn for it is patently false.

Robert also claims that certain testimony of the Estate's personal representative, James' daughter, should have been excluded under the Dead Man's Statute. That rule is disfavored in Wisconsin, and must whenever possible be strictly construed to prevent its use. *Hunzinger Constr. Co. v. Granite Res. Corp.*, 196 Wis. 2d 327, 333, 538 N.W.2d 804 (Ct. App. 1995). Robert claims that the personal representative should not have been allowed to testify as to whether the Estate had any partnership assets in its possession because, according to Robert, her knowledge on that topic was all gained from conversations with her deceased parents. The portions of the record to which Robert directs our attention do not bear this out. They suggest that some of the personal representative's knowledge came from communications with her parents, but certainly do not prove that she had no knowledge other than that communicated to

¶ 24. Robert finally claims that the court erred when, as a condition to stay execution of the judgment during appeal, it ordered him to deposit with the court the judgment amount plus 12% interest for one year. He argues that payment of the judgment to the court tolls interest, citing *Downey, Inc. v. Bradley Center Corp.*, 188 Wis. 2d 435, 524 N.W.2d 915 (Ct. App. 1994). However, in that case we were construing WIS. STAT. § 815.05(8), which requires that an execution of judgment provide for 12% interest "until it is paid." *Downey*, 188 Wis. 2d at 449. We held that a judgment is "paid" when it is paid to the court, not just when it is paid to the judgment owner. *Id.* In this case, the judgment was *not* executed, but was stayed by the circuit court. We stated in *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 224 Wis. 2d 312, 330, 592 N.W.2d 279 (Ct. App. 1998), that "[u]nder § 808.07(2), Stats., the trial court has broad discretion to stay the execution of a judgment and to condition such a stay upon terms it deems appropriate." In that case, we approved a stay that required the appellant to deposit the amount of judgment with the circuit court but did not provide the respondent 12% statutory interest. *Management Computer Services*, 224 Wis. 2d at 330. Instead, the circuit court placed the money in an interest-bearing account and awarded 6% interest to the respondent. *Id.* at 331. Here, the circuit court required Robert to pay the statutory interest, but again placed the money in an interest-bearing account and awarded the actual interest earned to Robert. This compromise arrangement, essentially the reverse of the one in *Management Computer Services*, comports with

her by her parents. The circuit court was free to take her testimony and assess its credibility as it saw fit.

the objectives of the postjudgment interest statute just as that one did. *See id.* at 331–32 (two objectives of postjudgment interest are to compensate prevailing parties for the time-value of their money and to compel timely payment).

¶ 25.   To recapitulate, on remand, we direct that the circuit court modify its judgment by awarding Robert compensation for his reasonable labor and management services to Matteson Communications for the time between dissolution and the date of trial. We also direct that this amount, along with Robert's storage expenses, be divided between Robert and the Estate on a 45%/55% basis in calculating the profits of the business. All other aspects of the circuit court's judgment are affirmed. No costs to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.